695 F.2d 34
 The PEOPLE of the State of New York, By Robert ABRAMS,
Attorney General of the State of New York, on
behalf of New York's mentally disabled
citizens, Appellee-Cross-Appellant,
v.
11 CORNWELL COMPANY, a New York Partnership, Appellant-Cross-Appellee.
 Nos. 1143, 1189, Dockets 82-7084, 82-7182.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1982.
Decided Nov. 30, 1982.
 
 Irwin Boyd Green, Lindenbaum & Young, P.C., Brooklyn, N.Y. (Richard Pilson, Sandra R. Schiff, Brooklyn, N.Y., of counsel), for appellant-cross-appellee.
 Jane Levine, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, Peter Bienstock, Deborah Bachrach, Asst. Attys. Gen., New York City, of counsel), for appellee-cross-appellant.
 Before LUMBARD, MOORE and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 11 Cornwell Company, a partnership owning a house, appeals from a judgment and various pretrial orders in favor of the State of New York, suing as parens patriae on behalf of mentally retarded citizens. The State cross-appeals from that part of the judgment denying its request for attorneys' fees. We affirm on the appeal and, with the author of this opinion dissenting, affirm on the cross-appeal.BACKGROUND
 
 
 2
 The State of New York filed suit in the United States District Court for the Eastern District of New York on August 1, 1980, on behalf of its mentally retarded citizens, alleging that 11 Cornwell had violated the 1871 Civil Rights Act, 42 U.S.C. Sec. 1985(3), and the New York Human Rights Law, N.Y.Exec. Law Sec. 296(5). The State alleged that upon learning that the Office of Mental Retardation and Developmental Disabilities (OMRDD) was planning to purchase the house at 11 Cornwell Street in Rockville Centre, New York, for use as a community residence for the retarded, a group of neighbors formed the partnership in order to prevent OMRDD from purchasing the house. The State argued that the partnership's purchase of the property, and refusal to sell to OMRDD even though the property was offered for sale to the general public, constituted a conspiracy to prevent and hinder the State from providing the mentally retarded with equal protection of the laws (42 U.S.C. Sec. 1985(3)), a conspiracy to deny the mentally retarded equal protection of the laws (42 U.S.C. Sec. 1985(3)), and discrimination on the basis of disability in the sale of housing (N.Y.Exec.Law Sec. 296(5)(a)). The State sought declaratory and injunctive relief, damages, attorneys' fees, and costs.
 
 
 3
 On February 18, 1981, Judge George C. Pratt denied 11 Cornwell's motion to dismiss the State's complaint for lack of standing and lack of federal jurisdiction. 508 F.Supp. 273 (E.D.N.Y.1981). He found that the State had standing in its parens patriae capacity to bring the suit, id. at 277, that the complaint stated a federal cause of action under the "preventing or hindering" clause of 42 U.S.C. Sec. 1985(3), 508 F.Supp. at 276, and that he would exercise pendent jurisdiction over the state-law claim, id. On August 7, 1981, Judge Pratt denied the parties' cross-motions for summary judgment, stating that the partnership's "state of mind," and the amount of damages, were contested issues of fact. After the State withdrew with prejudice its request for damages, Judge Pratt granted the State's motion to strike 11 Cornwell's demand for a jury trial.
 
 
 4
 The case was then reassigned to Judge Mishler, who after hearing evidence issued a Memorandum of Decision and Order. Judge Mishler found that in late 1979 an official of OMRDD determined that there was need for a facility for mentally retarded adults in Rockville Centre, and learned that the house at 11 Cornwell Street was for sale. Melvyn and Anne Samuels, the property's owners, were advised of OMRDD's interest in December 1979. In January 1980 they quoted a price of $135,000 and invited OMRDD to make an offer; through a real estate broker OMRDD transmitted an offer of $135,000 and was advised on February 1, 1980, that the Samuels had accepted the offer.
 
 
 5
 OMRDD advised the mayor of Rockville Centre of its plans on February 19, 1980, pursuant to New York Mental Hygiene Law Sec. 41.34. Shortly thereafter, as found by the court, about fifty neighbors attended a meeting called by Sidney Young, a real estate attorney whose house happened to adjoin that of the Samuels', to discuss the proposed community residence for the retarded. Other meetings followed, culminating in Young's designation as a spokesman for a group of neighbors interested in purchasing the Samuels' property. Young offered Mr. Samuels $120,000 on March 9; on March 10 Samuels suggested a price of $125,000 and then reached agreement with Young on a price of $122,500.
 
 
 6
 The neighbors' group had also decided to call a broader community meeting to discuss its concerns about the proposed residence for the retarded. This meeting was scheduled for March 11, to precede by one week the official meeting at which OMRDD was to explain the program and answer questions. Following the community meeting, during which the neighbors' plan to purchase the Samuels' house was not revealed, Young privately solicited neighbors to join the group. On March 14 the contract of sale was signed by Young "as nominee." Mrs. Samuels, the owner of record, then notified OMRDD that she had contracted to sell the property to another. On May 8, 1980, eighteen partners executed a certificate of partnership under the name 11 Cornwell Company. This partnership, the court found,
 
 
 7
 purchased 11 Cornwell Street, intending to resell it to a purchaser who would occupy it as a single family unit.... Defendant advertised the house for sale in the New York Times for $122,500. Prospective purchasers responding to the ad were advised by defendant that it was offered below the market price to defeat New York's plan to use it as a community residence for the mentally retarded. OMRDD's repeated offers to purchase the house from defendant ... met with negative responses.
 
 
 8
 Based on these findings the court held that the State's federal claim was substantial. Noting that "the preferred procedure is to first consider the state claim" (citing Hagans v. Lavine, 415 U.S. 528, 546, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974)), the court turned to the claim based on the New York Human Rights Law, N.Y.Exec.Law Sec. 296(5)(a)(2) ("unlawful ... [t]o discriminate against any person because of his ... disability ... in the ... privileges of the sale ... of any ... housing accommodation ..."). The court held that 11 Cornwell's actions "denied [a] housing accommodation to mentally retarded citizens because of their disability" in violation of that section pursuant to id. Sec. 297 and ordered 11 Cornwell to convey the property to OMRDD for $122,500. It is from this judgment and the certain pretrial orders that 11 Cornwell appeals.
 
 
 9
 Judge Mishler also noted in its November 23 decision that the State "would be entitled to an award of attorney's fees under [42 U.S.C.] Sec. 1988 if it were a private litigant." Upon examining section 1988 and its legislative history, however, the court held that a sovereign such as the State could not recover its attorneys' fees. From this decision the State cross-appeals.
 
 DISCUSSION
 A. Standing
 
 10
 Judge Pratt correctly held that the State had standing to bring this suit in its parens patriae capacity. As he noted, "representation of mentally disabled persons is the paradigm case for parens patriae standing." People of the State of New York v. 11 Cornwell Co., 508 F.Supp. 273, 277 (E.D.N.Y.1981) (denying motion to dismiss complaint). This is supported by Blackstone's classic definition of parens patriae standing to the effect that the sovereign or his representative was " 'the general guardian of all infants, idiots, and lunatics,' " and the superintendent of " 'all charitable uses in the kingdom.' " 3 W. Blackstone, Commentaries *47, quoted in Hawaii v. Standard Oil Co., 405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184 (1972).
 
 
 11
 The question is whether the State is an appropriate plaintiff in an action seeking to vindicate the constitutional rights of persons the statute does protect. Pennsylvania v. Porter, 659 F.2d 306, 314 (3d Cir.1981) (State has parens patriae standing to enforce Fourteenth Amendment against continuing police misconduct by a single police officer, condoned by major, police chief and borough council), cert. denied, --- U.S. ----, 102 S.Ct. 3509, 73 L.Ed.2d 1383. To answer this question requires analysis delineated by the Supreme Court in Alfred L. Snapp & Son, Inc. v. Puerto Rico, --- U.S. ----, 102 S.Ct. 3260, 73 L.Ed.2d 995 (Commonwealth has parens patriae standing to assert discrimination by Virginia applegrowers against Puerto Rican citizens and to assert violations of federal statutory scheme pertaining to temporary foreign workers). See also Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212 (2d Cir.1981).
 
 
 12
 Guided by Snapp, we must first determine whether New York has asserted a "quasi-sovereign" interest. Snapp, --- U.S. at ----, 102 S.Ct. at 3265. We do this both by identifying the State's interests and by distinguishing those interests from purely sovereign or proprietary interests, as well as from private parties' interests where the State serves merely as a nominal party. Id. at ---- - ----, 102 S.Ct. at 3267. We are to consider "indirect effects of the injury" as well as direct ones to determine "whether the state has alleged injury to a sufficiently substantial segment of its population." Id. at ----, 102 S.Ct. at 3267.[1]
 
 
 13
 What are the State of New York's interests here? Are they "quasi-sovereign" in nature? How substantial is the segment of its population affected? May the mentally retarded bring their own action so that the State's presence is purely nominal? To answer these questions we start with the obvious proposition that the defendant's actions affect more than any particular retarded person's interest in residing at 11 Cornwell Street. While the residence was to house eight to ten moderately retarded adults[2] plus two 24-hour "houseparents," plainly the inability to establish this facility (or others like it, in event of similar conspiracies to discriminate) is to deprive any number of retarded persons of the opportunity to receive rehabilitation. Preventing a residential facility also requires the State to bear the cost of keeping more people in institutions. It affects the people already there who are required to live in more crowded surroundings. Both retarded persons and community residents are deprived of being able to live in integrated communities. The analogy to racial discrimination is close indeed. See Pennsylvania v. Flaherty, 404 F.Supp. 1022, 1024 (W.D.Pa.1975) (parens patriae jurisdiction to enjoin racially discriminatory employment practices). Thus, the State of New York's interest in "the health and well-being ... of its residents in general," Snapp, --- U.S. at ----, 102 S.Ct. at 3267, the primary category of quasi-sovereign interests, is clearly implicated here.
 
 
 14
 So to a certain extent are its separate economic, if not its commercial, interests, id. at ----, 102 S.Ct. at 3269, insofar as the costs of care for the mentally retarded and the savings through their rehabilitation are concerned; at least we believe the State of New York, which has established a community-return policy for its mentally retarded citizens, may so consider it. And, as in Snapp, there is "a similar state interest in securing residents from the harmful effects of discrimination." Id. Whether all discrimination is "invidious," a matter well beyond the scope of this opinion, surely discrimination against the mentally retarded--people who usually through no fault of their own but who, from a variety of causes ranging from the congenital to the viral or traumatic cannot help their condition--is invidious. The State of New York has in our view no less an interest in seeing to it that its mentally retarded obtain equal protection under the housing laws than Puerto Rico has in seeing that its citizens obtain equal employment opportunities.
 
 
 15
 As to whether the State of New York "has alleged injury to a sufficiently substantial segment of its population," id. at ----, 102 S.Ct. at 3267, we have already indicated that involved are not just the few people who would first be moved from institutions or private homes to the residence at 11 Cornwell Street; affected, rather, are similar people in years to come as well as other individuals in those institutions and the members of the community itself, including the very neighbors who conspired. See Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 33-34 (1959). And, were this kind of incident to be tolerated and left without redress, countless others would be affected. The "sting" here is almost as "universal" as it was in Snapp. See --- U.S. at ----, 102 S.Ct. at 3265 (quoting Puerto Rico v. Alfred L. Snapp & Sons, Inc., 632 F.2d 365, 370 (4th Cir.1980)).
 
 
 16
 Parens patriae standing also requires a finding that individuals could not obtain complete relief through a private suit. Assuming mentally retarded citizens had brought a civil rights suit in connection with the State's proposed purchase at 11 Cornwell it is highly unlikely that they would be accorded standing in federal court. As Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), makes clear, plaintiffs challenging exclusionary housing practices must allege specific facts demonstrating personal harm and tangible benefit from the court's intervention. Id. at 504, 95 S.Ct. at 2208. See also Evans v. Lynn, 537 F.2d 571, 589 (2d Cir.1976) (en banc), cert. denied, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Individual retarded citizens would be speculating that New York's purchase of the residential facility would provide them with supervised housing.
 
 
 17
 Thus, having identified New York's quasi-sovereign interests, having answered the "substantial segment of the population" question in the affirmative, and having concluded that a private remedy is not available, we hold that the State has standing. If the State is an appropriate plaintiff, there is clearly federal question jurisdiction under 28 U.S.C. Sec. 1331 as amended, or civil rights jurisdiction under 28 U.S.C. Sec. 1343, or both.
 
 B. Substantiality of the Federal Claim
 
 18
 We also agree with the court below that the State's federal claim was sufficient to allow the court to exercise jurisdiction over the pendent state claim. People of the State of New York v. 11 Cornwell Co., No. 80 C 2139 (E.D.N.Y. Nov. 23, 1981) (Memorandum Decision and Order). The Supreme Court has stated that a federal court lacks jurisdiction to resolve pendent state claims only when the federal question is "so insubstantial, implausible, foreclosed by prior decisions of this Court or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court, whatever may be the ultimate resolution of the federal issues on the merits." Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974) (quoting Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666-67, 94 S.Ct. 772, 776-77, 39 L.Ed.2d 73 (1974)). This is not such a case; the State's claim under 42 U.S.C. Sec. 1985(3) is not, as 11 Cornwell argues, one whose "unsoundness so clearly results from ... previous decisions ... as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." Hagans v. Lavine, 415 U.S. at 537, 94 S.Ct. at 1379 (quoting Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933)). See Lynch v. Philbrook, 550 F.2d 793, 795 (2d Cir.1977). See also Friedman v. Berger, 547 F.2d 724, 727 & n. 6 (2d Cir.1976), cert. denied, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); Van Gemert v. Boeing Co., 520 F.2d 1373, 1380-82 (2d Cir.), cert. denied, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975).
 
 
 19
 Section 1985(3) provides in part as follows:
 
 
 20
 If two or more persons in any State or Territory conspire ... for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 21
 11 Cornwell contends that the State's claim under this provision is insubstantial on several grounds.[3] First, it is argued that the State did not aver a conspiracy between "two or more persons." The State did, however, allege that the members of the partnership had conspired through and with the partnership (Complaint paragraphs 16, 17), and that Mrs. Samuels had also been a party to the conspiracy (Complaint p 18). Certain courts have stated that there is no conspiracy when two or more agents of a corporation take action on behalf of the corporation, see, e.g., Girard v. 94th Street and Fifth Avenue Corp., 530 F.2d 66 (2d Cir.), cert. denied, 425 U.S. 947, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir.1972); but see Note, Intracorporate Conspiracies Under 42 U.S.C. Sec. 1985(c), 92 Harv.L.Rev. 470 (1978). But this reasoning does not apply at all to a partnership. A corporation is a distinct and fictional legal entity; a partnership is not distinct from its members at all. We decline, therefore, to find that the dictum to the contrary in Clark v. Universal Builders, Inc., 409 F.Supp. 1274, 1279 (N.D.Ill.1976), makes the allegation of conspiracy here frivolous. Moreover, it would be anomalous in any case to permit an entity which was established for the very purpose of engaging in a discriminatory act to be insulated, and to insulate its members, from liability as conspirators, by virtue of its establishment. See Dombrowski v. Dowling, 459 F.2d at 196 (recognizing a similar exception to its rule with respect to corporations). Additionally, the State's pleading that Mrs. Samuels participated in the conspiracy with the partnership, even with the State's later determination not to pursue its claims against Mrs. Samuels, alone would establish the court's jurisdiction.
 
 
 22
 The partnership's second contention is that the State failed to state a federal claim because it suffered no injury to a protected property interest, since it had not signed a contract to buy the house and had not fully complied with the procedures detailed in section 41.34 of the Mental Hygiene Law pertaining to notice to and objection by the municipality involved. To hold that the State has no claim because it had not yet signed a contract or taken the final steps to comply with the Mental Hygiene Law, however, would be absurd. 11 Cornwell's actions injured the State by preventing it from engaging in the very conduct whose absence the defendant would use to show there was no injury. Nor does the possibility of finding alternative housing prove that there was no injury; other houses are always theoretically available, and there was no evidence that the State would have canceled its plans to use the house at 11 Cornwell Street for the designated purpose had it found another suitable house.
 
 
 23
 The partnership's third contention is that the State's federal claim is completely and totally insubstantial, lacking any colorability whatsoever, because the actions complained of did not prevent or hinder the State from providing the mentally retarded with "equal protection of the laws" within the meaning of section 1985(3). The partnership's arguments, however, succeed only in demonstrating that serious legal issues would need to be resolved before the State could recover on its federal claim; they fail to demonstrate that the federal claim is not colorable.
 
 
 24
 We disagree with the argument that 11 Cornwell did not engage in a type of private conduct that might be actionable under section 1985(3). New York has an obligation under its own laws, N.Y. Mental Hygiene Law Secs. 41.34, 41.36, as well as the federal Constitution, see, e.g., O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), to release from institutional confinement those mentally retarded citizens who are not dangerous to themselves or others. New York chose to fulfill that obligation by establishing the equivalent of halfway houses for those retarded citizens not requiring institutionalization. Even though the Fourteenth Amendment may not have compelled the State to select this method of deinstitutionalization, the alleged conspiracy to hinder the State from carrying out its chosen means of securing substantive rights is, in our view, a colorable subject for an action under the "preventing or hindering" clause. See generally Life Insurance Co. of North America v. Reichardt, 591 F.2d 499, 505 (9th Cir.1979) ("Violations of state conferred rights and privileges are sufficient to constitute a deprivation of 'equal protection of the laws' ").[4]
 
 
 25
 Even under the approach used by the Fifth Circuit in McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir.1977) (en banc), 11 Cornwell's conduct here would be a colorable subject for a section 1985(3) action. The Fifth Circuit held that private action constitutes a deprivation of equal protection of the laws under section 1985(3) only when the action violates some federal or state law other than section 1985(3). Id. at 925. That condition is met here by the partnership's violation of the New York Human Rights Law. Nor would the partnership's conduct fall outside the scope of section 1985(3) under the less restrictive approach suggested in Note, Private Conspiracies to Violate Civil Rights, 90 Harv.L.Rev. 1721, 1731 (1977), namely, that the limitation on the type of private conduct the provision reaches be "a narrow one, designed to insure that certain private conduct ... which is bound up with associational and privacy interests is not subject to governmental regulation under section 1985(3)." 11 Cornwell's actions do not implicate any of the First Amendment interests at stake, e.g., in Weiss v. Willow Tree Civic Association, 467 F.Supp. 803, 816-17 (S.D.N.Y.1979) (Weinfeld, J.) (defendant spoke out against plaintiffs' zoning application and opposed it in court), or the privacy interests associated with membership in private clubs, in which, compared to housing, the State has a lesser interest.
 
 
 26
 We also find colorable the State's claim that 11 Cornwell's discrimination was class-based. Since it is equal protection that conspirators may not hinder the State from providing, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The State contends, without opposition on the issue from 11 Cornwell, that the mentally retarded are a class protected by section 1985(3). Cases since Griffin v. Breckenridge have been generous in applying section 1985(3) to nonracial classifications, even though some of the classifications would not receive strict scrutiny under the equal protection clause. The Eighth Circuit, for example, has held that supporters of an insurgent candidate for a tribal council presidency were a sufficient class for section 1985(3)/Griffin purposes. See Means v. Wilson, 522 F.2d 833, 839-40 (8th Cir.1975), cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976). The Sixth Circuit has found that supporters of a political candidate, see Cameron v. Brock, 473 F.2d 608, 610 (6th Cir.1973), were a sufficient section 1985(3) class. The Ninth Circuit, in Life Insurance Co. of North America v. Reichardt, 591 F.2d at 505, found that women purchasers of disability insurance were an appropriate class for section 1985(3) protection. And several courts have held that ethnic and religious groups are sufficient classes under section 1985(3). See, e.g., Marlowe v. Fisher Body, 489 F.2d 1057 (6th Cir.1973); Action v. Gannon, 450 F.2d 1227 (8th Cir.1971) (en banc); Weiss v. Willow Tree Civic Association, 467 F.Supp. at 812 & n. 15. The only case squarely holding that a class such as the mentally retarded is not protected under section 1985(3) is Cain v. Archdiocese of Kansas City, 508 F.Supp. 1021, 1027 (D.Kan.1981) (handicapped persons not a class), although the First Circuit has also expressed some doubt, see Downs v. Sawtelle, 574 F.2d 1, 16 (1st Cir.) (deaf persons), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978). These cases, in which the analysis is scant, are, with respect, unconvincing; they surely have not foreclosed the issue.[5]
 
 
 27
 In short, we think that both the nature of 11 Cornwell's conduct and the class basis of the discrimination complained of are sufficient to make out a colorable claim that 11 Cornwell prevented or hindered the State from providing the mentally retarded with "equal protection of the laws" within the meaning of section 1985(3).
 
 
 28
 Finally, 11 Cornwell contends that the State's federal claim is deficient because there was no state action in the conspiracy. In Griffin v. Breckenridge the Court held that section 1985(3) reached a private conspiracy against blacks. Limiting Griffin to actions premised on Congress's power under section two of the Thirteenth Amendment and on the constitutional right to travel in interstate commerce, District Judge Weinfeld in Weiss v. Willow Tree Civic Association held that section 1985(3) actions whose substantive foundation is in the Fourteenth Amendment do require state action. That holding, however persuasive, does not foreclose the issue. More important, Judge Weinfeld was not dealing in Weiss with the "preventing or hindering" clause of section 1985(3). Since there would almost never be a situation in which the State would be involved in hindering its own efforts to secure equal protection to its citizens, we think the State's position that state action is not required under the "preventing or hindering" clause is more than a colorable one.
 
 
 29
 We recognize that the State's position raises the question whether Congress has the power under section five of the Fourteenth Amendment to extend Fourteenth Amendment guarantees to purely private conduct. We need not resolve this question, however, for our inquiry is merely to decide whether the overall claim is a colorable one. The Supreme Court has left this question open, see Griffin v. Breckenridge, 403 U.S. at 107, 91 S.Ct. at 1801, although it has held that section 1985(3)'s criminal analogue, 18 U.S.C. Sec. 241, could constitutionally reach private conspiracies, see United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). Our own circuit has not resolved the issue. The Eighth Circuit has squarely held that "Congress was given the power in Sec. 5 of the Fourteenth Amendment to enforce the rights guaranteed by the Amendment against private conspiracies." Action v. Gannon, 450 F.2d at 1235. Thus we have no doubt that a claim that section 1985(3) can constitutionally reach private nonracial conspiracies is colorable.
 
 
 30
 Accordingly, the court below properly denied defendant's motion to dismiss and considered the pendent claim on the merits.
 
 C. Jury Trial
 
 31
 The appellant argues that it was entitled to a jury trial and that Judge Pratt's decision to the contrary requires reversal. Once the State withdrew its claim for damages, however, the suit was entirely in equity and there was no right to trial by jury. See Moore v. Townsend, 525 F.2d 482, 486 (7th Cir.1975). Nor has appellant demonstrated that it suffered any prejudice from the late withdrawal of the damage claim. In the week between Judge Pratt's decision to strike the jury demand and the beginning of the trial before Judge Mishler, 11 Cornwell had ample time to adjust its case for presentation before a judge rather than a jury.D. The State Claim
 
 
 32
 Appellant asserts that the evidence was insufficient to support the court's finding that it violated the New York Human Rights Law, N.Y.Exec.Law Sec. 296(5)(a)(2). This contention is frivolous. The State proved that the partnership was formed to purchase the house in order to prevent a group of mentally retarded persons from living there. Although 11 Cornwell attempts to show that it had a "nobler" motive--to keep the State from purchasing property that could later be used to house drug addicts--the district court was free to reject this rationalization, which in any event did not rebut the State's proof of the discriminatory effect or impact that is sufficient to establish a violation of section 296(5).
 
 E. Cross Appeal--Attorneys' Fees
 
 33
 The district court denied the State's request for attorneys' fees under 42 U.S.C. Sec. 1988 solely because the State was not a private litigant. My brothers agree for the reasons stated in Judge Lumbard's opinion. I disagree for the following reasons.
 
 
 34
 Section 1988 provides: "In any action or proceeding to enforce a provision of section[ ] ... 1985 ... of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." The court's denial of the State's request for fees here was not an exercise of its discretion under section 1988, but a finding that fees may not be awarded under that section to a prevailing party when it is a State.
 
 
 35
 Under a literal reading of the statute, or the simplest application of the maxim expressio unius est exclusio alterius, the district court's decision was in my view wrong: of all possible prevailing parties, section 1988 disqualifies only the United States from recovering attorneys' fees. This is, moreover, not a situation where to read the statute literally is to misread it. A "purposive interpretation" of the statute, see United States v. Perdue Farms, Inc., 680 F.2d 277 (2d Cir.1982) (Oakes, J., dissenting), is synonymous with the plain language.
 
 
 36
 Although Congress's main reason for enacting section 1988 was to enable private litigants to assert their civil rights, Congress's purpose is effectuated by construing the provision broadly, see Mid-Hudson Legal Services, Inc. v. G & U, Inc., 578 F.2d 34, 37 (2d Cir.1978), to permit state as well as local governmental agencies to recover fees when they prevail as plaintiffs. Finding the statutory language clear and "[n]othing in the history of the statute[ to] suggest[ ] that this language was meant to exclude state-funded entities," the Supreme Court recently affirmed an award of attorneys' fees to school districts that had prevailed in their action against the State. Washington v. Seattle School District No. 1, --- U.S. ----, ---- n. 31, 102 S.Ct. 3187, 3204 n. 31, 73 L.Ed.2d 896.
 
 
 37
 Attorneys' fees should similarly be awarded when the public entity advancing citizens' rights is the State itself, acting in its parens patriae capacity. A state attorney general's office, unlike its federal counterparts that Congress has declared ineligible for awards of attorneys' fees, is not funded by Congress. The prospect of recovering attorneys' fees makes it more likely that a state attorney general's office with limited resources will bring a potentially unpopular lawsuit on behalf of a group that on its own would be entitled to fees, but would probably be unable nevertheless to assert its rights. There is in my view simply no basis in section 1988's language or history for the court's refusal to award attorneys' fees to the prevailing plaintiff in this case. Accordingly, I would remand to the lower court for an assessment of reasonable attorneys' fees.
 
 
 38
 Affirmed on the appeal; affirmed on the cross-appeal. Costs to neither party.
 
 
 39
 LUMBARD, Circuit Judge (concurring, and writing for the court on the cross appeal):
 
 
 40
 Although Judge Moore and I agree with Judge Oakes in affirming the judgment of the district court in so far as it held that the State had standing to bring suit and granted relief against the defendants on the pendent state law claim, we would also affirm the district court's denial of the State's application for attorneys' fees.
 
 
 41
 The district court was guided by the general legislative purpose behind Sec. 1988, and it construed that purpose in light of the express statutory denial of the award of fees to the United States. This reasoning does not, as the State urges, constitute legal error. We agree with Judge Oakes that the statute's denial of fees to the United States does not bar the award of fees to a state-funded entity in appropriate circumstances. See Washington v. Seattle School District No. 1, --- U.S. ----, ---- n. 31, 102 S.Ct. 3187, 3204 n. 31, 73 L.Ed.2d 896 (refusing to disturb an award of fees in a Sec. 1983 suit brought by a state-funded school district.) However, we believe that the denial of fees to the United States does reflect a congressional judgment that government attorneys general supported by the public purse do not ordinarily need the possibility of recovering fees as an incentive to undertaking civil rights litigation.
 
 
 42
 In any event, the plain language of the statute makes crystal clear that the allowance of fees is discretionary: "... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee ..." 42 U.S.C. Sec. 1988 (1980). The district court found that the State, which is hardly in the same position as the ordinary private litigant, did not need the incentive of a Sec. 1988 in order to carry out its law enforcement duties. Judge Mishler specifically found that "a state performing its duty to mentally retarded citizens in bringing the action as parens patriae is not a private attorney general vindicating rights that would otherwise be denied." (Emphasis added.) He also found that the purpose of the Fees Act, to encourage litigants to vindicate their rights and to promote compliance with those rights, "would not be served by awarding fees." The State does not seriously challenge these findings, nor could it. Nothing in the record suggests that the Attorney General's decision to undertake such litigation is in any way influenced by the possibility of recovering expenses.
 
 
 43
 Moreover, it seems to us that no federal court should encourage a state to enforce its own statutes in a federal forum at federal expense when its own courts are readily available. In such a case, it would be an abuse of discretion to grant fees.
 
 
 
 [1]
 We note that Justices Brennan, Marshall, Blackmun, and Stevens would go one step further. "At the very least, the prerogative of a State to bring suits in federal court should be commensurate with the ability of private organizations." --- U.S. at ----, 102 S.Ct. at 3271 (Brennan, J., concurring). Surely if an association for the mentally retarded were the party plaintiff, it would have standing. See, e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977)
 
 
 [2]
 The Director of the New Jersey Division of Mental Retardation testified that moderately retarded adults are "for the most part, very self-sufficient"; they are able to feed and dress themselves and to communicate with others, and can be competitively employed in jobs such as messenger or porter. Individuals with Down's Syndrome are typically classified as moderately retarded
 
 
 [3]
 Judge Pratt found the claim based on the "preventing or hindering" clause of section 1985(3) to be substantial. Accordingly he did not reach the question whether the State's additional claim under section 1985(3) that 11 Cornwell conspired to deprive mentally retarded persons as a "person or class of persons" of equal protection of the laws was substantial. In light of our holding below agreeing with Judge Pratt that the "preventing or hindering" claim was substantial, we likewise need not reach the substantiality of the additional claim
 
 
 [4]
 11 Cornwell argues that its actions did not violate section 1985(3) because they did not cause the State to violate the equal protection clause of the Fourteenth Amendment, citing a sentence from Justice Stevens's concurrence in Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 384, 99 S.Ct. 2345, 2355, 60 L.Ed.2d 957 (1979). The thrust of the sentence, however, is not directed to the situation here, where the State has adopted a given means to carry out its Fourteenth Amendment obligations, and the alleged private conspirators prevent or hinder the State from effectuating those means. In any event, one Justice's expression of his views does not foreclose the issue from being one of serious controversy
 
 
 [5]
 We note that Senator Edmunds of Vermont, discussing the Ku Klux Klan Act, stated that if "it should appear that [a] conspiracy was formed against [a] man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, (which is a pretty painful instance that I have in my mind in the State of Florida within a few days where a man lost his life for that reason,) then the section could reach it." Cong. Globe, 42d Cong., 1st Sess. 567 (1871), quoted in Statutory History of the United States: Civil Rights Part 1 623 (B. Schwartz ed. 1970)