**SUPPORT MINISTRIES FOR PERSONS WITH AIDS, INC., et al., Plaintiffs,**

v.

**VILLAGE OF WATERFORD, NEW YORK, et al., Defendants.**

**Civ. No. 92–CV–539 RWS.**

United States District Court,
N.D. New York.

July 30, 1992.

De Graff, Foy, Holt–Harris & Mealey (James T. Potter, of counsel), Albany, N.Y., for plaintiff Support Ministries For Persons With Aids, Inc.

Robert Abrams, Atty. Gen., State of N.Y. (Sanford M. Cohen, Donna I. Dennis, Robert R. Reed, of counsel), New York City, for plaintiffs Robert Abrams and Mary Jo Bane.

Donohue, Sabo, Varley & Armstrong, P.C. (Kenneth G. Varley, of counsel), Alba-

ny, N.Y., for defendants Village of Waterford, et al.

## MEMORANDUM–DECISION AND ORDER

SMITH, United States Magistrate Judge.

This matter was referred to the undersigned on June 23, 1992, by the Honorable Frederick J. Scullin, Jr., U.S. District Judge, for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and upon consent of the parties.

### I. BACKGROUND

Plaintiff Support Ministries for Persons With Aids, Inc., is a non-profit corporation with a Board of Directors comprised of representatives from numerous religious denominations from throughout the Capital District region and concerned individuals within the community. This plaintiff operates a residence for homeless persons with AIDS (PWAs) in the City of Albany and has submitted an application to the Department of Social Services (DSS) for an operating certificate to establish and operate an adult care facility for homeless PWAs at 31 Sixth Street, Waterford, New York. (Complaint at paragraph 5). According to a Program Document issued by Support Ministries, their mission

> is to minister to HIV infected people who lack the physical ability to live independently, or the financial and support resources to secure living arrangements conducive to their well-being. This entails moving people out of shelters, hotels/motels or off the street, where isolation and inconsistent care can hasten their demise. The immediate need is for a safe and secure residence for PWAs, a place where they can work toward greater independence. Therefore, the residence will provide services consistent with this goal. Residents are expected to [be] independent in all normal activities of daily living.

(Defendants' Exhibit B).

In June 1990 Support Ministries located the Waterford building, which was con-

structed in 1880 as a residence for Roman Catholic priests and was later occupied commencing in 1953 by the Sisters of Mercy. Around 1960 an addition was put onto the building which enabled the housing of up to 15 persons. The property was purchased in 1984 by the Holy Cross Fathers and was utilized as a novitiate for the training of incoming novices. From that time until 1990 five staff and faculty members and up to nine candidates for the order were housed in the building. (Complaint at paragraph 12).

Support Ministries entered into negotiations with the Holy Cross Novitiate, Inc., in July 1990 to purchase that property. At that time Support Ministries informed the Waterford community of its intentions with respect to the property and began a series of informational meetings (Complaint at paragraph 13), which were held on September 25 and 26, 1990. (Complaint at paragraphs 14 and 15).

On approximately November 28, 1990, before Support Ministries completed its purchase of the property, the Board of Trustees of the Village of Waterford adopted Local Law No. 2 of 1990, which was to take effect immediately, amending the definition of the term "boarding house" contained in the Village's zoning ordinance to read as follows:

BOARDING HOUSE AND ROOMING HOUSE: A private dwelling in which at least four but not more than six sleeping rooms are offered for rent and board may be furnished to roomers, and in which no transients are accommodated. A boarding or rooming house shall not include a nursing home, convalescent home, hospice, or other building which is primarily intended to provide accommodation for persons suffering from or re- covering from or recuperating from any illness or disease or whose occupants regularly receive any medical or nursing care or treatment.

(Local Law No. 2 of the Year 1990). Since September 7, 1965, the term "boarding house" had been defined as a private dwelling in which four but not more than ten sleeping rooms are offered for rent and table board may be furnished to roomers, and in which no transients are accommodated. In addition, rooming and boarding houses were listed as special permitted uses in residential districts. (Complaint at paragraph 16).

Support Ministries applied to the New York State Homeless Housing and Assistance Corporation, which is administered by DSS, for funding assistance for the Waterford project. DSS determined that there is a very significant need for housing among PWAs in the Capital Region and made a conditional reservation of funds under the Homeless Housing and Assistance Program to establish the proposed adult care facility for PWAs at the Waterford property. DSS notified Support Ministries on January 7, 1991, of the conditional award of up to $530,000 to be used toward the cost of acquisition and rehabilitation. (Complaint at paragraph 21).

Support Ministries completed its purchase of the Waterford property on May 29, 1991. The previous month the New York State Office of Parks, Recreation and Historic Preservation determined that the project would have no adverse impact upon 31 Sixth Street. (Complaint at paragraph 19). On November 6, 1991, the New York State Homeless Housing Assistance Corporation determined that the proposed use of the facility would have no significant adverse environmental impact. (Complaint at paragraph 22).

On October 10, 1991, the Zoning and Building Inspector of the Village of Waterford issued a decision refusing Support Ministries' request for a certificate of occupancy, stating that a variance would be needed before the property could be occupied. (Complaint at paragraph 23). Consequently, on October 31, 1991, Support Ministries applied to the Waterford Zoning Board of Appeals (ZBA) seeking two alternative forms of administrative relief. First, they sought a determination that their proposed use constituted the continuation of a pre-existing non-conforming use within the meaning of the local zoning ordinance and New York's common law. Second, they sought a special use permit. In

connection with this application, Support Ministries also sought a variance from the operation of Local Rule No. 2 of 1990 and from the provision of the local zoning ordinance requiring one parking space for each resident of the facility. (Complaint at paragraph 24).

The ZBA referred the matter to the Saratoga County Planning Board, which on December 19, 1991, voted to return the matter for local consideration, finding that there would be no adverse county-wide impact. (Complaint at paragraph 25).

Public hearings were then held by the ZBA over a three-month period, on January 9, February 13, and March 12, 1992. Thereafter, on March 26, 1992, the ZBA denied Support Ministries' application in its entirety. (Complaint at paragraph 26). The ZBA found that the proposed use by Support Ministries did not constitute a continuation of a prior non-conforming use because the use of the building as a convent at the time of original enactment of the zoning ordinance was conforming. In addition, they determined that in any event the non-use of the building for more than a year would have extinguished any right to a non-conforming use of the property. The application for a special permit was thus denied since the ZBA found that the proposed use of the building did not fall within the new definition of a boarding house. Due to these findings, the ZBA did not specifically pass upon Support Ministries' variance requests. (See Defendants' Exhibit D, Transcript of the ZBA's decision).

Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 3601 et seq., 28 U.S.C. § 2201 et seq., sections 296(5)(a)(2) and 296(6) of the New York Executive (Human Rights) Law, section 40–c of the New York Civil Rights Law, section 7–712 of the New York Village Law, and Article 78 of the New York Civil Practice Law and Rules. They seek to redress alleged arbitrary and unlawful discrimination by defendants on the basis of a handicap, namely, AIDS, as defendants have refused to allow plaintiffs to open a residence for homeless PWAs and thus have allegedly violated the rights of persons with disabilities under the Federal Fair Housing Act, 42 U.S.C. § 3601 et seq., the Fourteenth Amendment, New York Executive (Human Rights) Law, and New York Civil Rights Law. (Complaint at paragraph 1).

Presently before the court is defendants' motion to dismiss the claims of the People of the State of New York by Robert Abrams, Attorney General (AG) of the State of New York, and Mary Jo Bane as Commissioner of DSS (the state plaintiffs) on the ground that they lack standing. In addition, defendants move to dismiss the pendent state law claims of all plaintiffs. Plaintiffs oppose this motion, and reply briefs from all of the parties were accepted and considered by this court.

The state plaintiffs included with their opposition papers a supporting affidavit by Mark Lewis, Deputy Commissioner for Executive Services in support of the New York State DSS. Due to the submission of that affidavit, in an Order dated June 30, 1992, this court converted defendants' motion to dismiss to one for summary judgment and accordingly gave the parties time within which to file any and all material made pertinent to such a motion by Rule 56 of the Federal Rules of Civil Procedure. No such material was filed by the parties.

## II. STANDING

The state plaintiffs sue in both their *parens patriae* and proprietary capacities. They claim that "[t]he State has a proprietary interest in ensuring that it is able affectively [sic] to carry out its policy of developing community-based adult care facilities for homeless citizens with AIDS and a quasi-sovereign interest in protecting the health and welfare of all its citizens." (Complaint at paragraph 3).

Very recently the Supreme Court summarized the three elements of the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). These three elements are:

First, the plaintiff must have suffered an "injury in-fact"—an invasion of a legally protected interest which is (a) concrete

and particularized, ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'".... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely", as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* (citations omitted). The burden of establishing these three elements falls upon the party invoking federal jurisdiction. *Id.* "[W]hen the plaintiff [such as the state plaintiffs here] is not himself object of the governmental action or inaction he challenges, standing is not precluded, but it is substantially more difficult to establish." *Id.*

Defendants assert that the state plaintiffs have failed to meet the minimum standing requirements under the Federal Fair Housing Act and section 1983 because the state plaintiffs have failed to make the necessary allegations of a distinct, palpable, and concrete injury to their particular interests which is fairly traceable to any alleged action by the defendants. It is asserted that the ZBA's denial of a special use permit to a particular applicant has not caused a personal injury to the AG, DSS, or the People of the State of New York.

In light of the fact that the Village's local zoning ordinance may very well be different from numerous localities across the state, defendants contend that it certainly cannot be said that the denial of a special use permit pursuant to the Village's ordinance has an overall effect on the People of the State of New York. Defendants contend that to hold otherwise would effectively eliminate every municipality's discretion to interpret and apply their local zoning ordinance and would also provide standing to the AG in any case involving the interpretation or application of a local zoning law, which was certainly not the intention of the Fair Housing Act.

Defendants claim that the only interest of DSS appears to be that DSS would process Support Ministries' application for an operating certificate as an adult home. Defendants assert that it is difficult to see how the inability of DSS to process this application has caused them to sustain a genuine injury so as to provide them standing to maintain this lawsuit. It is further contended that the alleged frustration of general policies and interference with the processing of an application are simply general grievances not sustained by any factual allegation of real injury. Any alleged injury is allegedly so remote, indirect, and speculative as to not constitute a sufficient basis for standing in the instant action. Thus, the state plaintiffs have allegedly asserted nothing more than a general grievance and have failed to show any causal nexus between their alleged injury and the defendants' actions.

Defendants also assert that the state plaintiffs do not have standing to maintain a suit under the doctrine of *parens patriae* as they have failed to allege any quasi-sovereign interest apart from the grievances of Support Ministries. According to defendants, the State clearly cannot be heard to argue that the State as a whole or even a substantial segment of the population has been affected by any alleged conduct on the part of the defendants. These plaintiffs are merely seeking to intervene on behalf of a small, distinct element of New York society whose interests are already adequately represented in this litigation by Support Ministries. There allegedly is absolutely nothing in the complaint to even remotely suggest that Support Ministries is incapable of pursuing this action on its own behalf.

Furthermore, defendants assert that the State's alleged claim of economic injury is based on a chain of hypothetical assumptions and is the classic "conjectural" or "hypothetical" injury as opposed to the "concrete" and "particularized" injury required to meet the minimum constitutional requirements for standing as defendants' actions do represent a real threat to the State's economic health. Rather, the State's alleged injury is allegedly an inge-

nious argument of counsel to justify the involvement of the AG and the DSS in this action.

It is also suggested by the defendants that the AG's interjection into this suit is primarily for his own personal political purposes as he is a candidate for the Democratic senatorial nomination, and in a recent newspaper article Mr. Abrams cited his bringing of this lawsuit as a basis to show that he supports gay rights. Thus, defendants assert that Mr. Abrams' inclusion of his name in this suit is for political, and not judicial, purposes.

The state plaintiffs, however, assert that they have met all three parts of the standing test. This court agrees.

■ To maintain a *parens patriae* action, the State must allege an injury to a "quasi-sovereign" interest. *People of the State of N.Y. by Abrams v. 11 Cornwell Co.,* 695 F.2d 34, 38–39 (2d Cir.1982), *mod. on other grounds,* 718 F.2d 22 (1983) (en banc). In making a determination as to whether the state plaintiffs have asserted such an interest, this court is "to consider 'indirect effects of the injury' as well as the direct ones to determine 'whether the state has alleged injury to a sufficiently substantial segment of the population.'" *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). As correctly pointed out by the state plaintiffs, the Supreme Court has stated "a State has a quasi-sovereign interest in the health and well-being—both physical and economical— of its residents in general." *Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269. The Second Circuit has also stated that the state's interest in the "health and well-being ... of its residents in general" is the "primary category of quasi-sovereign interest." *Cornwell,* 695 F.2d at 39.

■ This court agrees with the state plaintiffs that the State has alleged an injury to its quasi-sovereign interest in the health and well-being of its citizens. Defendants' alleged discriminatory conduct endangers the physical health of PWAs by denying them the benefits that a residential care facility would provide and by sub- jecting them to an increased risk of prolonged homelessness and deterioration of their medical condition.

Furthermore, this court disagrees with defendants that the state plaintiffs have not "alleged injury to a sufficiently substantial segment of its population." *Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269. Although Support Ministries proposes housing only up to fifteen PWAs at the Waterford facility at one time, those initial fifteen PWAs are not the only persons who will be or have been affected by defendants' actions. *See Cornwell,* 695 F.2d at 39. Rather, also affected are similar PWAs in months and years to come, as well as the members of the community itself, including the very neighbors who rallied against the Support Ministries' project. *Id., see Snapp,* 458 U.S. at 609, 102 S.Ct. at 3270 (State has interest in securing residents from "the harmful effects of discrimination.").

Tragically, the number of PWAs is not insubstantial and is ever-increasing. Mark Lewis, Deputy Commissioner for Executive Services in Support of DSS, states in his affidavit that:

> According to epidemiological statistics compiled by the New York State Department of Health (DOH) as of March 31, 1992, there were a cumulative total of 35,032 cases of full-blown AIDS documented in New York State. Of this number, 29,206 are known to have died and 15,826 are still living with AIDS. The (DOH) estimates that there are between 150,000–200,000 people infected with HIV in the state. The majority of these people currently show no, or few, signs of HIV infection, but over time are expected to develop AIDS as defined by the federal Centers of Disease Control (CDC).

(Lewis affidavit at paragraph 7). With regard to the Capital District, Lewis states that the DOH has reported a total of 361 CDC-defined AIDS. (Lewis affidavit at paragraph 8). Furthermore, while "[t]here are no official estimates of the number of HIV-infected people in the Capital District ..., epidemiologists confirm that the actual

number of infected people in a given region is many times higher than the total number of reported AIDS cases in that region. The [DOH] estimates that by 1996, CDC-defined AIDS in New York State will increase to between 91,600 and 117,500 cases." (Lewis affidavit at paragraph 9). Lewis also reports that the DOH estimates that 4,500 persons with HIV-related illnesses are now homeless or temporarily housed throughout the state.

Based upon these startling statistics, which have not been disputed by defendants, this court cannot agree with their assertion that the alleged injury is not to a substantial segment of the population. As the state plaintiffs assert, "it is difficult to see how the interests of thousands of people living with AIDS in New York State, and hundreds of thousands of HIV-infected people who are likely to develop AIDS, can fairly be characterized as 'small.'" (State plaintiffs' response to defendants' reply memorandum at page 3). In addition, as correctly noted by the state plaintiffs, in facts very similar to the instant case, the Second Circuit held that a neighborhood group's discriminatory opposition to a residence which would house up to ten mentally retarded persons affected a sufficiently substantial segment of New York's population to confer *parens patriae* standing upon the State of New York. *Cornwell*, 695 F.2d at 39–40.

With regard to the direct, economic interests of the State, this court disagrees with the defendants that any possible injury is fanciful, remote, and speculative and is merely an ingenious argument of counsel to justify the State's involvement in this action. Given the alarming statistics set forth in the Lewis affidavit concerning the number of PWAs and the unfortunate reality that the incidence of AIDS and HIV-related illness has become inexplicably linked with poverty (Lewis affidavit at paragraph 6), which naturally leads to a demand for public housing, it is clear that the State has an economic interest in the instant action.

■ According to the Lewis affidavit, DSS "has learned that many homeless PWAs are languishing in hospitals because they have no home or available supportive housing to which to be discharged. This untenable situation contributes to a considerable financial strain on hospitals and health care systems." (Lewis affidavit at paragraph 16). Lewis also reports the staggering difference between the cost of an individual's placement in a residential facility, a nursing home, and a hospital (respectively, $8,796, $43,200, and $270,000; the State's share of which is respectively $4,860, $17,280, and $108,000) (Lewis affidavit at paragraphs 16–22). Obviously, placement of homeless PWAs in residential care facilities is much less costly to the State than their placement in medical facilities. Based on these facts, this court finds that the state plaintiffs have alleged sufficient economic injury to the State by the defendants' prevention of the establishment of the Waterford residence for PWAs so as to establish the state plaintiffs' standing in this action. This alleged injury is likely, not speculative, contrary to defendants' assertions. *See Cornwell*, 695 F.2d at 39 (consideration of the state's economic interests insofar as the cost of the care for the mentally retarded were concerned).

Furthermore, it is conceivable that a private action by Support Ministries may not produce complete relief for all of the persons injured. *See Commonwealth of Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). Support Ministries has obviously expended considerable financial resources toward the acquisition of the Waterford property, not to mention the cost of the instant litigation. While it is apparent that their goal is to establish this group home for PWAs, it is always possible that at some point they could decide to "cut their losses" by compromising their claim for injunctive relief in the interest of obtaining a monetary settlement. While defendants feel that Support Ministries would not do so, this court notes that that plaintiff is a not-for-profit corporation which apparently has limited resources. As the state plaintiffs correctly assert, the vindication of the rights of New Yorkers to be

free from discrimination against the disabled cannot be made dependent on the actions and potentially limited resources of private parties. *See Id.* at 217 (There is no assurance that the individuals could bear the cost of a lawsuit that would achieve complete relief).

In sum, this court finds that the federal claims of the state plaintiffs should not be dismissed for lack of standing because the State of New York has *parens patriae* standing. This court agrees with the state plaintiffs that they have alleged sufficient injury to the State's own interests and to a sufficiently large segment of its population to dispel any notion that it is merely a nominal party.

Furthermore, given the findings above concerning the injury to the State's economic interests, this court further finds that the state plaintiffs have proprietary standing. This court agrees with these plaintiffs that the State's economic interest in reducing or maintaining the costs of providing care to PWAs is sufficient to invoke this court's jurisdiction.

### III. DISMISSAL OF STATE LAW CLAIMS

Defendants seek the dismissal of all the state claims because the case presents novel procedural and substantive questions under state law, and, therefore, resolution is best left to the New York State courts. Such a dismissal allegedly would not adversely affect the plaintiffs as there are more than ample means for them to seek relief in the state courts under the New York law provisions. Thus, in the interests of comity and state's rights, such pendent jurisdiction allegedly should not be exercised.

Defendants also claim that dismissal of the pendent state law claims will have the effect of simplifying the instant lawsuit and expediting resolution of the substantive issues because exercising pendent jurisdiction will only serve to complicate the instant action and unduly burden its progress to trial. In light of the fact that discovery has not begun and that a trial date has not been scheduled, it is asserted that denial of jurisdiction over the state law claims will not adversely prejudice the plaintiffs.

Finally, defendants assert that plaintiffs' claim under Article 78 of the New York Civil Practice Law and Rules should be dismissed on its face as that article simply provides a state court procedure by which the New York Supreme Court can review agency and municipality decisions. The federal courts allegedly lack jurisdiction over such proceedings because the statutory scheme is clear that the Supreme Court, except in limited situations, has exclusive jurisdiction. Defendants thus contend that an Article 78 claim is properly left to state resolution and should be dismissed for lack of jurisdiction.

Pursuant to 28 U.S.C. § 1367(a), which was enacted on December 1, 1990, this court has "supplemental jurisdiction" to retain plaintiffs' state law claims. That statute provides:

Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district court has original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. ...

28 U.S.C. § 1367(a). It is further provided in section 1367(c)(1), however, that if the claim raises a novel or complex issue of state law, this court may decline to exercise such "supplemental jurisdiction" over the state law claims. 28 U.S.C. § 1367(c)(1).

Prior to the enactment of this statute, the Supreme Court held that the decision to exercise "pendent" jurisdiction is vested in the sound discretion of the district court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966). The Court further stated, however, that that discretion is limited by the consideration that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by

procuring for them a surer-footed reading of applicable law." *Id.* at 726, 86 S.Ct. at 1139. The Court also stated that "[s]ome have seen this consideration as the principal argument against exercising of pendent jurisdiction," noting that one judge had counseled that "[f]ederal courts should not be over-eager to hold on to the determination of issues that might be more appropriately pressed to settlement in state court litigation." *Id.* at 726 n. 15, 86 S.Ct. at 1139 n. 15.

■ Plaintiffs apparently dispute defendants' assertion that the application of the state laws in the instant case involves novel questions as they believe it is clear from the language of the statutes in question that the defendants' conduct is violative of the state provisions. Plaintiffs, however, have not cited any authority on point that addresses the state questions at issue here. Thus, while it is true that the federal and state claims arise out of the same operative set of facts and will probably involve virtually the same proof at trial, this court, in its discretion, chooses to decline to exercise supplemental jurisdiction over all of the state law claims, including the claim under Article 78. As asserted by the defendants, there is no reason for this court to embroil itself in a dispute between the State and a local government and to make this novel and potentially extremely significant interpretation of state law. *See Fay v. South Colonie Cent. School Dist.*, 802 F.2d 21, 31 (2d Cir.1986) (District Court need not decide the pendent claim due to the presence of unresolved questions under New York State law); *Independent Bankers Ass'n of N.Y. State, Inc. v. Marine Midland Bank, N.A.*, 757 F.2d 453 (2d Cir.1985) (The Second Circuit questioned the district court's wisdom of adjudicating a state law question in federal court before any New York State court had passed on it.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986).

While Support Ministries argues that supplemental jurisdiction should be retained in the interests of judicial economy and the expeditious resolution of all issues relating to this case, "[t]he judicial econo-my factor should not be the controlling factor...." *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 564 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991). "A district court should refrain from 'reach[ing] out for ... issues, thereby depriving state courts of opportunities to develop and apply state law....'" *Id.* (quoting *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 757 (2d Cir.1986)).

Furthermore, this court notes that in a case management plan recently filed and signed by all parties, it is stated that it is possible that following discovery, either plaintiffs or defendants will conclude that no triable issues of fact remain and that summary judgment is appropriate. In cases which are decided without trial on motions for summary judgment, the Second Circuit has expressed that it has even less concern about judicial economy where there are novel state law questions presented. *Independent Bankers Ass'n*, 757 F.2d at 464–65 (citing *Financial Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 778 (D.C.Cir.1982)). The court stated that in such a case the plaintiffs can refile their state law complaint in state court, using the same documents in support of their federal court case. *Id.* In addition, the Second Circuit has instructed that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment...." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). The United States District Court for the Southern District of New York has also stated that dismissal of the state law claims under such circumstances is "recommended." *Coalition Against Columbus Ctr. v. City of N.Y.*, 750 F.Supp. 93, 96 (S.D.N.Y.1990), *rev'd in pt. on other grounds, aff'd in pt.*, 967 F.2d 764 (2d Cir.1992) (affirmed judgment granting summary judgment to the defendants on the pendent claims for the reasons set forth in the District Court's opinion); *Kaplan v. Shapiro*, 655 F.Supp. 336, 342 (S.D.N.Y.1987). This court does

not believe that exceptional circumstances are present in the instant case.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED, that defendants' motion to dismiss the claims brought by plaintiffs People of the State of New York by Robert Abrams, Attorney General of the State of New York, and Mary Jo Bane as Commissioner of the New York State Department of Social Services, due to lack of standing is denied, and it is further

ORDERED, that defendants' motion to dismiss the pendent state law claims is granted.