State of CONNECTICUT

v.

**PHYSICIANS HEALTH SERVICES OF CONNECTICUT, INC.**

**No. CIV.A. 3:99CV2402 SR.**

United States District Court, D. Connecticut.

July 13, 2000.

Richard Blumenthal, Atty. General, State of Conn., Admin. Dept., Hartford, CT, Charles C. Hulin, Office of Atty. Gen., Hartford, CT, Michael E. Cole, Shipman & Goodwin, Hartford, CT, for State of Conn.

David S. Poppick, Elizabeth S. Torkelsen, Epstein, Becker & Green, P.C., Washington, DC, for Physicians Health Services.

## RULING ON DEFENDANT'S MOTION TO DISMISS

UNDERHILL, District Judge.

This proposed class action raises allegations that the prescription drug benefit offered by the defendant, Physicians Health Services of Connecticut, Inc. ("PHS"), uses a drug formulary that obstructs enrollees' access to prescription medications that their physicians believe are most safe and effective. The plaintiff, State of Connecticut ("Connecticut" or "the State"), has brought suit in its capacity as *parens patriae* and as the assignee of certain individual PHS enrollees. The State asserts claims for equitable relief pursuant to Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3), which permits a "participant, beneficiary, or fiduciary" in a health care plan established pursuant to ERISA to bring an action "to enjoin any act or practice which violates any provision . . . of the plan, or . . . to obtain appropriate equitable relief." Currently pending is the defendant's January 24, 2000 Motion to Dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The fundamental issue raised by the motion to dismiss is whether the State of Connecticut has standing, either under the doctrine of *parens patriae* or as the assignee of rights of various named participants, to bring an ERISA civil enforcement action under section 502(a)(3). Congress carefully limited the persons authorized to bring an ERISA civil enforcement action, and any such plaintiff must be either "a participant, beneficiary, or fiduciary." The State does not meet any of these statutory requirements of standing, and cannot overcome its omission from section 502(a)(3) either through the doctrine of *parens patriae* or through assignment of rights from persons who would have standing. Accordingly, the defendant's motion to dismiss **(doc. # 10)** is granted.

## I. Background

In its complaint, the State alleges that PHS uses a drug formulary that obstructs enrollees' access to prescription medications that their physicians believe are most safe and effective. The State's principal allegations regarding PHS' drug formulary system can be paraphrased as follows:

(1) PHS uses a prior approval process that pressures physicians and patients into using medications that PHS prefers. If a medication is not preferred, PHS will deny coverage unless the physician submits and PHS approves a prior approval request. Prior approval may be granted if PHS determines that the non-preferred drug is medically necessary for the particular patient.

(2) PHS' determination whether a drug is "preferred," is based largely on cost factors rather than effectiveness.

(3) Physicians and enrollees are pressured to accept a preferred drug even when it is not the drug originally prescribed by the physician and even when the preferred drug is less safe and less effective than the drug originally prescribed.

(4) PHS uses a variety of techniques to persuade physicians and enrollees to "switch" from a prescribed drug to a preferred drug, including the denial of coverage for non-preferred drugs and the imposition of onerous prior-approval paperwork.

*See* Compl. at 2–3, ¶ 3.

The State alleges that, although ERISA requires PHS to fully inform enrollees about the nature of their health plan benefits, PHS has failed to disclose the nature of the formulary system. Connecticut also alleges that, although ERISA requires that an enrollee receive written notice when coverage for a plan benefit is denied, including instructions on how to appeal, PHS fails to give enrollees any notice at all. Accordingly, the State claims that PHS has violated its fiduciary duty under

ERISA to administer its health plan solely in the interest of its enrollees and has injured enrollees by maintaining a drug formulary in a manner that serves its own financial interest.

The complaint sets forth three claims. The first claim alleges that PHS has breached its fiduciary duty under ERISA. The State alleges that PHS is a "fiduciary" as that term is defined in ERISA section 3(21)(A), 29 U.S.C. § 1003(21)(A), and that ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires a fiduciary to discharge its duties "solely in the interest of participants [employees] and beneficiaries [their dependents]." *See* Compl. at 27, ¶ 83. The State claims that PHS has breached its fiduciary duty to enrollees by obstructing enrollees' access to safe, effective and medically necessary prescription medications. *Id.*

The second claim alleges that PHS breached certain ERISA disclosure obligations. Specifically, the State alleges that:

ERISA requires that each plan participant and beneficiary shall be given a summary plan description written in a manner calculated to be understood by the average plan participant, sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan and containing, among other things, information regarding the plan's requirements respecting eligibility for participation and benefits and the circumstances which may result in disqualification, ineligibility or denial or loss of benefits. ERISA § 102, 29 U.S.C. § 1022. In addition, ERISA § 104(b), 29 U.S.C. § 1024(b), requires that a summary description of any reductions in covered services must be provided to participants and beneficiaries within 60 days after the changes are adopted.

Compl. at 27, ¶ 85. The State alleges that PHS fails to disclose to enrollees the information required by these provisions. The State claims, for example, that PHS fails to disclose that:

(a) PHS lists prescription drugs as preferred not because of their effectiveness but because of their low cost. The preferred drugs are inexpensive because the defendant has received discounts and rebates from pharmaceutical companies in exchange for including their drugs on the preferred list.

(b) PHS will deny coverage for a prescribed medication even though the preferred substitute may be less safe or less effective.

(c) PHS makes no individualized determination whether the medication prescribed by the attending physician is medically necessary for that particular patient unless the attending physician somehow learns of the denial and initiates a time consuming "prior approval process."

(d) When it denies coverage for a non-preferred medication PHS does not inform the attending physician.

(e) When it denies coverage for a non-preferred medication PHS does not give the enrollee a written denial notice or explanation of appeal rights.

Compl. at 28, ¶ 86.

The third claim alleges that PHS breached certain ERISA notice obligations. Specifically, the State alleges that "Section 503(1) of ERISA, 29 U.S.C. § 1133(1), provides that every employee benefit plan must 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits has been denied, setting forth specific reasons for such denial ....'" Compl. at 29, ¶ 89. The State further alleges that the written denial must include:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an

explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

Compl. at 29, ¶ 89, *citing* 29 C.F.R. 2560.503–1(b). The State alleges that PHS fails to provide enrollees with the detailed notices that the State claims are required by law.

 In support of these claims, the complaint identifies eight individual PHS members that the State alleges are representative enrollees who have had access to safe and effective prescription medicines obstructed by the PHS drug formulary. Attached to the complaint are the affidavits of all of the representative enrollees, setting forth allegations of the significant difficulty they experienced in obtaining coverage for certain necessary medication that their physicians prescribed and allegations of the considerable suffering they endured as a result. The State claims that these representative enrollees have experienced serious pain and suffering, delays in

recovery of benefits and unnecessary out-of-pocket expense because PHS: obstructed their access to prescription medications their physicians prescribed; failed to disclose to them the full nature of the PHS formulary system; and failed to give them proper notice of the denial of coverage and instructions on how to appeal.[1]

All eight individuals have executed an "Assignment of Cause of Action Under ERISA," copies of which are attached to the complaint. In those assignments, each individual states:

> I hereby assign to the State of Connecticut any cause of action I may have arising from my status as a participant in or beneficiary of an employee welfare benefit plan established pursuant to the Federal Employee Retirement Income Security Act of 1974 ("ERISA"), upon the following conditions:
>
> 1. I believe my managed care organization has improperly and illegally obstructed my access to safe and effective prescription medications. I believe many other Connecticut residents have been injured in a similar

---

**1.** PHS claims that, contrary to the State's allegations that PHS harmed these eight individuals by obstructing access to safe and effective prescription medications, the affidavits of the individual attached to the complaint reveal a different story. Specifically, PHS argues that seven of the eight individuals ultimately received the precise medication prescribed by their doctors and that the eighth failed to pursue any of the appeal and review procedures available to her.

Accordingly, the court has considered whether the claims raised in the complaint are moot. Although the eight participants named in the complaint may no longer be pursuing coverage for the precise medication prescribed by their doctors, the exception to the mootness doctrine for cases "capable of repetition yet evading review" applies here. *See, e.g., Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (case may not be moot if the underlying dispute between is "capable of repetition, yet evading review"); *Fulani v. League of Women Voters Educ. Fund,* 882 F.2d 621, 628 (2d Cir.1989) (case is "capable of repetition, yet evading review" where "[t]he issues prop-

erly presented, and their effects, ... will persist in [the] future ... and within a time frame too short to allow resolution through litigation.") (citations omitted). Moreover, there is a line of Supreme Court decisions standing for the proposition that the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (citing cases). These decisions and the doctrine they reflect would be quite relevant here if the issue of mootness arises by reason of unilateral action by the defendant to grant individual relief. Otherwise, "(t)he defendant is free to return to [its] old ways, and this fact would be enough to prevent mootness because of the public interest in having the legality of the practices settled." *Id.* Still, if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to·a federal judicial forum. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* ── U.S. ──, ──, 120 S.Ct. 693, 709, 145 L.Ed.2d 610 (2000).

way. I cannot afford to hire private attorneys to protect my rights under ERISA.

2. By this assignment I intend to empower the State of Connecticut, by and through the Attorney General, to take action to protect me, and people like me, pursuant to 29 U.S.C. 1132(a)(3), which provides that I, or my assignee, may bring an action to enjoin any act or practice which violates the terms of my health care plan, or to obtain other appropriate equitable relief to redress such violations or to enforce provisions of ERISA or the plan. I agree to cooperate with the Attorney General's Office in any such action, and I agree that the facts of my case should be made public. I am willing, if necessary, to testify under oath.

3. Any positive result the Attorney General is able to obtain will help me, and other people in my position, to receive the medically necessary prescription medications to which we are entitled and which are essential to our health and well-being.

Assignments of Cause of Action Under ERISA, attached to Complaint as Plaintiff's Exhibits 1–8.

Thus, in its complaint the State of Connecticut asserts claims for equitable and injunctive relief pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), in its capacity as the assignee of the named individual enrollees, and also in its capacity as *parens patriae.* The State specifically requests that this court enter an order:

(a) requiring the defendant to provide its enrollees with the prescription medications ordered by the attending physician unless the defendant submits to the Court, and the Court approves, a plan for substituting the defendant's preferred medications for those originally prescribed while insuring [sic] that (i) the substitution is approved by the attending physician and (ii) the enrollee experiences no unreasonable delay before receiving an appropriate medication;

(b) requiring the defendant to comply with the dictates of ERISA and disclose to enrollees information sufficient to inform them fully and accurately, prior to their enrollment or re-enrollment in the plan, concerning the nature of the prescription drug benefit to which they are entitled; and

(c) requiring that whenever an enrollee requests coverage of a prescription drug by presenting a completed prescription form to a participating pharmacy and coverage is denied, the defendant shall give the enrollee a written denial notice setting forth the specific reason for the denial, and the steps necessary to file an appeal.

Compl. at 4–5, ¶ 5 and at 30, ¶ 91.

## II. *Standard of Review*

When deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all factual allegations in the complaint and must construe any well pleaded factual allegations in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991). In addition, the court must draw inferences in the light most favorable to the plaintiff. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. Dismissal is not warranted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Hishon v. Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"); *Still v. DeBuono,* 101 F.3d

888, 891 (2d Cir.1996). The issue on a motion to dismiss "is not whether the plaintiff will prevail, but whether [it] is entitled to offer evidence to support [its] claims." *United States v. Yale New Haven Hosp.*, 727 F.Supp. 784, 786 (D.Conn. 1990) (*citing Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683).

The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984), *quoting Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). The motion must therefore be decided solely on the facts alleged. *See Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985). In deciding such a motion, consideration is limited to the facts stated in the complaint or in documents attached thereto as exhibits or incorporated therein by reference. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

**2.** *See, e.g.*, S.Rep. No. 93–127, p. 35 (1973), 1 Leg. Hist. 621; H.R.Rep. No. 93–533 at 17, 2 Leg. Hist. 2364; H.R.Rep. No. 103–601(II), 103rd Cong., 2nd Sess.1994, 1994 WL 388009 at *1995–2000.

**3.** 29 U.S.C. § 1132(a) provides:
**(a) Persons Empowered to Bring a Civil Action**
A civil action may be brought—
(1) by a participant or beneficiary (A) for the relief provided for in subsection (c) of this section, or (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title;
(5) except as otherwise provided in subsection (b) of this section, by the Secretary

## III. *Discussion*

There is no authority in the Second Circuit, and very little elsewhere, regarding a state's standing to bring an ERISA civil enforcement action either under the doctrine of *parens patriae* or as the assignee of participants in a group health insurance plan. Nor is there legislative history that sheds much light on these issues.[2] As a result, this decision depends largely upon a plain reading of section 502(a)(3), principles of statutory construction, and federal preemption of the field to the exclusion of the states.

### A. Standing Under Section 502(a)(3) of ERISA.

The State is not included among those identified in section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), as authorized to bring an enforcement action. Subsection (a) of that section,[3] entitled "Persons empowered to bring a civil action," provides that: "A

(A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;
(6) by the Secretary to collect any civil penalty under paragraph (2), (4), (5), or (6) of subsection (c) of this section or under subsection (i) or (*l*) of this section;
(7) by a State to enforce compliance with a qualified medical child·support order (as defined in section 1169(a)(2)(A) of this title);
(8) by the Secretary, or by an employer or other person referred to in section 1021(f)(*l*) of this title, (A) to enjoin any act or practice which violates subsection (f) of section 1021 of this title, or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection; or
(9) in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, by any individual who was a participant or

civil action may be brought—... (3) by a participant, beneficiary, or fiduciary ...." The State does not argue that it qualifies as a participant, beneficiary, or fiduciary with respect to the PHS plans at issue in this case.

Apparently recognizing that section 502(a)(3) does not empower the State to bring this action in its own right, Connecticut argues that it derives standing to sue both from the doctrine of *parens patriae* and from the State's status as the assignee of plan participants and/or beneficiaries. The State's arguments are inconsistent with the statutory scheme of section 502(a), a provision that "itself demonstrates Congress' care in delineating the universe of plaintiffs who may bring certain civil actions." *Harris Trust and Savings Bank v. Salomon Smith Barney Inc.,*— U.S. ——, 120 S.Ct. 2180, 2187, 147 L.Ed.2d 187 (2000) (citations omitted). Congress carefully limited the persons empowered to bring a civil enforcement action under section 502(a)(3) to "a participant, beneficiary, or fiduciary." 29 U.S.C. § 1132(a)(3). The State cannot easily overcome its omission from section 502(a)(3).

When construing a statutory provision, the proper analysis "begins with the language of the statute .... And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). Section 502(a) provides a clear answer to the question whether the State can bring an action under section 502(a)(3). The inference that Congress intentionally omit-

ted states from section 502(a)(3) finds strong support in the fact that states are expressly empowered by section 502(a)(7) to bring only a very limited class of cases. 29 U.S.C. § 1132(a)(7) (action may be brought "by a State to enforce compliance with a qualified medical child support order ...."). Having empowered states to bring one type of ERISA enforcement action, Congress would surely have included states in section 502(a)(3) had it intended to empower them to bring actions such as the present one. *Cf. Commonwealth of Pennsylvania, Department of Public Welfare v. Lubrizol Corp. Employee Benefits Plan,* 737 A.2d 862, 867 n. 6 (Pa.Cmwlth. 1999) ("It is clear, however, that when Congress intended to provide a civil action for a State with respect to pension plans it clearly did so."; citing section 502(a)(7)).[4] Similarly, the statutory provisions relating to state acquisition of the rights of third parties through assignment, which are limited to reimbursing the states for payments made under state plans for medical assistance, *see* 29 U.S.C. § 1169(b), would have included a broader empowerment of the states to use assignments from third parties had Congress intended to grant broader rights.

A similar, strong inference of Congressional intent arises from the fact that Congress empowered the Secretary of Labor to bring certain actions in section 502(a)(5). 29 U.S.C. § 1132(a)(5). Congress' care in delineating which parties can bring which actions is evident in the slight differences between subsections (a)(3) and (a)(5). In subsection (a)(5), Congress empowered the Secretary, a governmental representative,

beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts.

**4.** The Commonwealth Court of Pennsylvania is an intermediate level appellate court creat-

ed by an amendment to the Pennsylvania Constitution in 1968. The court operates in conjunction with the Pennsylvania Superior Court—also an intermediate level appellate court—and, among other things, hears appeals regarding public sector issues that are considered by multi-judge panels. *See, e.g.,* "The Court for Appeals—and Trials—of Public Issues: The First 25 Years of Pennsylvania's Commonwealth Court," 4 Widener J. Pub.L. 321 (1995).

to bring precisely the types of actions authorized by subsection (a)(3)—except for actions to enjoin acts or practices that violate terms of an ERISA plan and actions to enforce the terms of the plan. *Compare* 29 U.S.C. § 1132(a)(3) (authorizing actions "(A) to enjoin any act or practice which violates any provision of this title *or the terms of the plan,* or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title *or other terms of the plan.*") (emphasis supplied) *with* 29 U.S.C. § 1132(a)(5) (same, but for italicized language). In light of this careful parsing of claims that can be brought by particular parties, *the court cannot conclude that a governmental entity not even mentioned in section 502(a)(3) can have broader indirect rights to sue than the rights expressly reserved to another governmental actor, the Secretary of Labor, in section 502(a)(5).*

Although Congress did not specifically prohibit suits by states under the theories of standing raised in the present case, Congress spoke loudly with its silence. Under established principles of statutory construction, the specific inclusion of subsection (7) in section 502(a) amply demonstrates Congress' intent to limit suits by states to the claims identified in subsection (7). The general language of subsection (3) of the statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment," *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) (citations and internal quotations omitted), "particularly when the two [provisions] are interrelated and closely positioned, both in fact being parts of" the same statutory scheme. *HCSC–Laundry*

*v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981) (per curiam).

In short, the "carefully integrated civil enforcement provisions found in § 502(a) of the statute … provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (emphasis in original). Although *Russell* dealt with the issue of remedies rather than standing, the reasoning of that decision applies with equal force here. Not surprisingly, therefore, "[f]ederal courts have predominantly treated the terms of the Act as exclusive and have denied standing to plaintiffs not specifically enumerated therein." *St. Francis Hospital and Medical Center v. Blue Cross & Blue Shield of Connecticut, Inc.,* 776 F.Supp. 659, 661 (D.Conn.1991) (citation omitted); *see also Lifetime Medical Nursing Services, Inc. v. New England Health Care Employees Welfare Fund,* 730 F.Supp. 1192, 1195 (D.R.I.1990) (majority of federal courts have treated section 1132 as exclusive) (collecting cases). Although there is nothing in the legislative history expressly indicating that the list of parties empowered to sue under section 502 is exclusive,[5] the Second Circuit has expressly stated that

> [w]e focus not on whether the legislative history reveals that Congress intended to prevent actions by employers or other parties, but instead on whether there is any indication that the legislature intended to grant subject matter jurisdiction over suits by employers, funds or other parties not listed in § [502] …. we therefore conclude that absent such expression, § [502] should be viewed as an exclusive jurisdictional grant.

**5.** There is also nothing in the legislative history that conflicts with this interpretation. *See* S.Rep. No. 93–127, p. 35 (1973), 1 Leg. Hist. 621 (describing Senate version of enforcement provisions as intended to "provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of [ERISA]"); H.R.Rep. No. 93–533 at 17, 2 Leg. Hist. 2364 (describing House version in identical terms); H.R.Rep. No. 103–601(II), 103rd Cong., 2nd Sess.1994, 1994 WL 388009 at *1995–2000. *See also Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

*Pressroom Unions–Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889, 892 (2d Cir.1983).

Neither of the parties nor the court has found any decision on the precise question whether states have standing under section 502(a)(3) to bring suit as *parens patriae* or as the assignee of plan participants.[6] The statutory scheme suggests that such standing is unavailable to the states.

## B. *Parens Patriae* Standing

### 1. *Parens Patriae Factors*

■■■■ To prevent "injury to those who cannot protect themselves," the common law has always recognized the prerogative of the sovereign to bring suit on behalf of its citizens as *parens patriae,* the "parent of the country." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("*Snapp*"); *see also People of the State of New York v. Mid Hudson Medical Group, P.C.,* 877 F.Supp. 143, 146 (S.D.N.Y.1995); Black's Law Dictionary 1114 (6th ed.1990). The requirements of *parens patriae* standing have been clearly defined by the Supreme Court and the Second Circuit Court of Appeals. In *Snapp,* the Supreme Court held that, in order to establish *parens patriae* standing: (1) the State must have "alleged injury to a sufficiently substantial segment of its population;" (2) the state "must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party;" and (3) the state "must express a quasi-sovereign interest." 458 U.S. at 607, 102 S.Ct. 3260.[7] Additionally, the United States Court of Appeals for the Second Circuit has interpreted *Snapp* to require a finding that the State act on behalf of individuals who could not obtain complete relief through a private suit. *People of the State of New York v. 11 Cornwell Co.,* 695 F.2d 34, 40 (2d Cir.1982), *vacated in part on other grounds,* 718 F.2d 22 (2d Cir. 1983) (en banc); *see also Peter & John's Pump House, Inc.,* 914 F.Supp. at 811–12; *Mid Hudson Medical Group,* 877 F.Supp. at 148–49.[8]

### a. *"Substantial Segment" of the State Population*

PHS argues that the State has not alleged an injury to a sufficiently substantial segment of its population because the claims asserted are for injuries to only eight of its citizens. The State responds that the individuals referenced in its com-

---

**6.** In an action by the California Chamber of Commerce and others for declaratory and injunctive relief, the Central District of California, in ruling on whether enforcement of state law and procedures with respect to severance benefit plans had been preempted by ERISA, stated, in dicta, that California Labor Code § 98(a) and 96(h).

> intrude[] on Congress' delegation of the "parens patriae" function under ERISA to the Secretary of Labor. Under the act, the Secretary has plenary authority to bring civil actions including equitable relief to redress any individual violation. 29 U.S.C. § 1132(a)(5). Again, the Congressional scheine does not contemplate that state labor commissioners should exercise a similar *parens patriae* function to redress asserted individual violations of ERISA's benefit provisions by taking assignments of such claims and prosecuting them on behalf of employees.

*California Chamber of Commerce v. Simpson,* 601 F.Supp. 104, 109 (C.D.Cal.1985).

**7.** "Courts in this circuit have enumerated the requirements differently or focused on different aspects of the test, but they agree on the relevant considerations. *Compare, e.g., People of the State of New York v. Mid Hudson Medical Group, P.C.,* 877 F.Supp. 143, 146 (S.D.N.Y.1995) *with People of the State of New York v. Holiday Inns, Inc.,* 656 F.Supp. 675, 677 (W.D.N.Y.1984)." *People of the State of New York v. Peter & John's Pump House, Inc.,* 914 F.Supp. 809, 811 n. 2 (N.D.N.Y.1996).

**8.** "This 'additional' requirement is consistent with the Supreme Court's statement that a state acting merely as a nominal party has no *parens patriae* standing. *Snapp,* 458 U.S. at 600, 102 S.Ct. at 3265. In other words, if the state has no quasi-sovereign interest apart from the interests of private individuals, who can obtain complete relief through their own litigation, then no *parens patriae* standing exists." *Peter & John's Pump House, Inc.,* 914 F.Supp. at 811 n. 3.

plaint are representative of others and their experiences are illustrative examples of the alleged problems with the PHS drug formulary.

The raw number of individuals directly involved does not determine whether the State has alleged injury to a sufficiently substantial segment of its population. *See Snapp*, 458 U.S. at 607, 102 S.Ct. 3260; *Mid Hudson Medical Group*, 877 F.Supp. at 148. Moreover, there is no magic number of affected citizens necessary to establish *parens patriae* standing:

> The [Supreme] Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population.

*Snapp*, 458 U.S. at 607, 102 S.Ct. 3260; *see also Peter & John's Pump House, Inc.*, 914 F.Supp. at 812.

Indeed, "[t]he majority of courts in this circuit broadly construe the 'substantial segment' requirement of *parens patriae* standing." *Peter & John's Pump House, Inc.*, 914 F.Supp. at 812. For example, in *11 Cornwell Co.*, the Second Circuit rejected a challenge to *parens patriae* standing where the state alleged discrimination against eight to ten proposed group home residents who were mentally retarded. The court reasoned that future group home residents, people living in mental health institutions, and the community at large also would be affected "were this kind of incident to be tolerated without redress." *11 Cornwell Co.*, 695 F.2d at 39–40. *Parens patriae* standing was also sustained where the state alleged discrimination against fifteen proposed group home residents who had AIDS, on the theory that the discrimination affected future

group home residents, the community at large, and the entire population of people with AIDS. *Support Ministries for Persons with Aids, Inc. v. Village of Waterford*, 799 F.Supp. 272, 277 (N.D.N.Y.1992). Similarly, in *Mid Hudson Medical Group*, the district court permitted *parens patriae* standing where the state alleged that a hospital discriminated against its seven to ten hearing-impaired patients. Again, the court decided that the effect of the defendant's alleged conduct "threaten[ed] all hearing impaired citizens and perhaps disabled citizens throughout New York." *Mid Hudson Medical Group*, 877 F.Supp. at 148.

Accepting the truth of plaintiff's allegations for purposes of the present motion, the State has alleged injury to more than the eight specifically identified residents. *See Snapp*, 458 U.S. at 607, 102 S.Ct. 3260. The individual enrollees' experiences represent examples of the alleged obstructions by PHS to prescription medications that enrollees' physicians believe are most safe and effective. *See, e.g.*, Assignments of Cause of Action Under ERISA, attached to Complaint as Exhibits 1–8 ("I believe my managed care organization has improperly and illegally obstructed my access to safe and effective prescription medications. I believe many other Connecticut residents have been injured in a similar way."). As noted by at least two other courts in this circuit, the "Attorney General's use of a small group of 'aggrieved persons' as exemplars for a larger class is neither new nor objectionable...." *Peter & John's Pump House, Inc.*, 914 F.Supp. at 813; *Mid Hudson Medical Group*, 877 F.Supp. at 147. The State's allegations and requests for injunctive relief clearly implicate more than just the eight named individuals—indeed, they could affect all Connecticut residents who are enrollees in PHS health plans, and could indirectly affect Connecticut residents who are enrollees in other plans as well. The State therefore meets the first test of *parens patriae* standing, alleged injury to a suffi-

ciently substantial segment of its population.

### b. *Connecticut as More Than a Nominal Party*

For the same reason, the State of Connecticut is more than a nominal party. To meet this test, Connecticut must show an interest apart from the interests of particular private parties. *Snapp*, 458 U.S. at 607, 102 S.Ct. 3260. The relief sought by the complaint, if granted, would likely enure to the benefit of all Connecticut residents who are enrollees in PHS health plans. The State has alleged injury to a substantial segment of Connecticut's population because the eight individuals identified in the complaint "are not the only persons who will be or have been affected by defendant['s] actions. Rather, also affected are similar [individuals] in months and years to come." *Mid Hudson Medical Group*, 877 F.Supp. at 148, *citing Support Ministries*, 799 F.Supp. at 277. Accordingly, the state has articulated an interest apart from the interests of the particular private parties referenced in the complaint. *See Peter & John's Pump House, Inc.*, 914 F.Supp. at 813; *Mid Hudson Medical Group*, 877 F.Supp. at 147 ("The Attorney General's use of a small group of 'aggrieved persons' as exemplars for a larger class ... does not render him a nominal party.").

### c. *Quasi–Sovereign Interest*

A more difficult question is whether Connecticut has a viable quasi-sovereign interest in the subject matter of this ERISA enforcement action. As an initial matter, it is unclear that a state can have a quasi-sovereign interest under ERISA—a field that has been broadly preempted by Congress.

The State argues that it has a quasi-sovereign interest in protecting the physical health of its citizens. The court agrees. The Supreme Court has observed that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents *in general.*" *Snapp*, 458 U.S. at 607, 102 S.Ct. 3260 (emphasis added); *see also Mid Hudson Medical Group, Inc.*, 877 F.Supp. 143. The Second Circuit has also stated that the state's interest in the "health and well-being ... of its residents *in general*" is the "primary category of quasi-sovereign interest." *11 Cornwell Co.*, 695 F.2d at 39 (emphasis added); *see also Support Ministries*, 799 F.Supp. at 277. Although the state has alleged an injury to its quasi-sovereign interest in the health and well being of its citizens, the question remains whether Connecticut's *general* interest in the health and welfare of its citizens, on balance, can overcome the broad preemptive scope of ERISA.

The State argues that the ERISA preemption clause does not apply to the present litigation because the State "relies solely on ERISA itself. The relief requested is appropriate only because ERISA requires it." *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 17. The State argues that it has not used any state law or taken any other state action having the effect of law with respect to this lawsuit. *Id.* Given the far reaching preemptive scope of ERISA, the court disagrees.

ERISA was designed to protect the interests of employees and their beneficiaries in employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). ERISA's comprehensive regulatory scheme, however, was intended to establish the regulation of benefit plans as "exclusively a federal concern." *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). In order to maintain federal control over benefit plan regulation, ERISA contains a "very broad preemption clause." *Hydrostorage, Inc. v. Northern California Boilermakers*, 891 F.2d 719, 726 (9th Cir.1989), *cert. denied*, 498 U.S. 822, 111 S.Ct. 72, 112 L.Ed.2d 46 (1990). This preemption clause, contained in section 514(a) of

ERISA, 29 U.S.C. § 1144(a), provides, in pertinent part, that

> the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .

The term "State law" is defined expansively to include "all laws, decisions, rules, regulations, *or other State action having the effect of law* . . . ." 29 U.S.C. § 1144(c) (emphasis added). Thus, subject to certain exceptions not applicable here, Congress intended ERISA to have a broad preemptive scope, occupying the entire field of regulation of employee benefit plans. *Shaw*, 103 S.Ct. at 2900–01.

As set forth above, the State seeks comprehensive injunctive and equitable relief and, specifically, an order

> (a) requiring the defendant to provide its enrollees with the prescription medications ordered by the attending physician unless the defendant submits to the Court, and the Court approves, a plan for substituting the defendant's preferred medications for those originally prescribed while insuring [sic] that (i) the substitution is approved by the attending physician and (ii) the enrollee experiences no unreasonable delay before receiving an appropriate medication;

> (b) requiring the defendant to comply with the dictates of ERISA and disclose to enrollees information sufficient to inform them fully and accurately, prior to their enrollment or re-enrollment in the plan, concerning the nature of the prescription drug benefit to which they are entitled; and

> (c) requiring that whenever an enrollee requests coverage of a prescription drug by presenting a completed prescription form to a participating pharmacy and coverage is denied, the defendant shall give the enrollee a written denial notice setting forth the specific reason for the denial, and the steps necessary to file an appeal.

Compl. at 4–5, ¶ 5 and at 30, ¶ 91. Notwithstanding the State's argument that it is merely seeking to have PHS comply with existing ERISA requirements, the far reaching relief requested by the State would affect the regulation of benefit plans, an exclusively federal concern. If granted standing to sue under section 502(a)(3), the State could, through litigation, obtain relief relating to ERISA benefit plans that it could not otherwise mandate through "laws, decisions, rules, or regulations." Because virtually every ERISA enforcement action could be grounded on a general interest in the health and well being of its citizens, the State's argument would establish a quasi-sovereign interest in every ERISA enforcement action raising issues common to multiple plan participants. Where, as here, the State has sought comprehensive relief under ERISA, permitting *parens patriae* standing would permit an end run around the ERISA preemption clause.

[6] The court agrees that the State has a *general* interest health and well being of its residents. Congress, however, has precluded the State from having a quasi-sovereign interest in the specific relief sought by this lawsuit. In short, the State's general interest cannot overcome the specific and focused preemptive scope of ERISA, "the most sweeping preemption statute ever enacted by Congress." *California Chamber of Commerce v. Simpson,* 601 F.Supp. 104, 109 (C.D.Cal.1985).

#### d. *Complete Private Relief*

[7] Although it is a very close call, the court also concludes that the State lacks *parens patriae* standing because the alleged victims of PHS' drug formulary may obtain complete relief through private or other litigation brought on their behalf. Specifically, this factor weighs against the State because of the designation in ERISA of the United States Secretary of Labor as the government representative to act on behalf of plan participants and because ERISA contains provisions providing for

an award of reasonable attorneys' fees and costs.

The State argues that "[t]his case is not just about the individual assignees whose problems with PHS form part of the basis for bringing this claim. The relief that is sought is class-wide injunctive relief rather than damages or individualized relief for any specific plan beneficiary." Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 26. The State argues that the mere possibility that an individual could obtain relief for himself or herself does not preclude the State from seeking complete relief for all current and future enrollees, and that this case has a much broader scope than the considerable problems the named individuals faced in their dealings with PHS. *See id., citing Mid Hudson Medical Group*, 877 F.Supp. at 149; *Peter & John's Pump House, Inc.*, 914 F.Supp. at 809; *Support Ministries*, 799 F.Supp. at 278–79; *Commonwealth of Massachusetts v. Bull HN Information Systems, Inc.*, 16 F.Supp.2d 90, 102 (D.Mass.1998) ("The Attorney General is seeking broad injunctive relief of a kind that individual litigants likely would not attempt to seek."). The State further argues that each individual PHS plan participant's injury is relatively small, making it virtually impossible for individual claims to be pursued against PHS. Finally, the State argues that most private individuals do not have the resources or stamina for prolonged litigation of the sort contemplated by the complaint in this case. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 26, *citing Mid Hudson Medical Group*, 877 F.Supp. at 149.

Although the court is mindful of, and empathizes with, the State's concerns, those concerns are undercut by the grant of standing to the Secretary of Labor, which one court has described as "Congress' delegation of the 'parens patriae' function under ERISA to the Secretary of Labor." *California Chamber of Commerce*, 601 F.Supp. at 109. Under section 1132(a)(5), the Secretary of Labor has plenary authority to bring civil actions, including those for equitable relief, to redress any individual violation of ERISA. *See* 29 U.S.C. § 1132(a)(5) ("A civil action may be brought ... by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter."). As discussed more fully below, ERISA's unique statutory scheme does not contemplate that a State may exercise a similar *parens patriae* function to redress asserted individual violations of ERISA's benefits provisions. *See California Chamber of Commerce*, 601 F.Supp. at 109.

The State's concerns are further ameliorated because ERISA specifically provides that reasonable attorneys' fees and costs may be awarded by a federal court to either party to a suit brought pursuant to section 502. *See* 29 U.S.C. § 1132(g)(1) ("In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."); *see also* H.R.Rep. No. 103–601(II), 103rd Cong., 2nd Sess. 1994, 1994 WL 388009 at *1998–99 ("This section also amends section 502(g) of ERISA, to provide that in any action or settlement proceeding under this title with respect to a health plan by a participant or beneficiary under such plan in which the participant or beneficiary prevails or substantially prevails, the participant or beneficiary shall be entitled to reasonable attorney's fees, reasonable expert witness fees, and other reasonable costs relating to the action. Fees to which the participant or beneficiary is entitled under this paragraph shall be at generally prevailing hourly rates."). Thus, there is an economic incentive for private attorneys who have the resources and stamina for the type of prolonged litigation contemplated by the State, to bring private civil actions pursuant to section 502—particularly where, as

here, the complaint seeks relief on behalf of several individuals or on a class-wide basis. The effectiveness of the attorneys' fee provisions is amply demonstrated by the numerous ERISA class action cases brought since the enactment of the attorneys' fees provision.

Although the court recognizes that the interests of the State may not necessarily be coextensive with those of individual victims, and that private litigants might not achieve the State's idea of complete relief because they might have a greater incentive to compromise broad requests for injunctive relief in exchange for more individualized relief, the unique provisions of ERISA provide adequate alternative means of civil enforcement by which individual plaintiffs may obtain complete relief. Specifically, Congress' delegation of enforcement authority to the Secretary of Labor and ERISA's attorneys' fees provision diminish traditional concerns that private litigants will be unable to obtain complete relief without State *parens patriae* standing.

## 2. *ERISA's Statutory Scheme*

The State argues that *parens patriae* standing has been found to. exist under many federal statutes and accordingly, its omission from ERISA is of no consequence. It is true that federal courts have frequently granted states *parens patriae* standing to enforce a variety of federal statutes that do not specifically provide standing for suits by states, including 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Americans with Disabilities Act ("the ADA") and the Fair Housing Act. *See Mid Hudson Medical Group*, 877 F.Supp. at 146 (collecting cases). Each of these statutes, however, differs from ERISA in one significant respect: unlike ERISA, which expressly *limits* the class of persons enti-

tled to bring suit, the federal statutes under which states have been granted *parens patriae* standing all contain broad civil enforcement provisions. Indeed, they all permit suit by any "person" that is "injured" or "aggrieved." *See, e.g.*, 42 U.S.C. § 1983 ("Every person who, under color of any statute, regulation, custom, or usage, of any State or Territory or the District of Colombia subjects or causes to be subjected, *any citizen* of the United States *or other person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to *the party injured* in an action at law, suit in equity, or other proper proceeding for redress . . . .") (emphasis added); 42 U.S.C. § 1985 ("If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, *any person or class of persons* of the equal protection of the laws, or of equal privileges and immunities under the laws . . . *the party so injured or deprived* may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."); 42 U.S.C. § 12117(a) ("The powers, remedies and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to *any person* alleging discrimination on the basis of disability in violation of any provision of this chapter . . . ."); 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to *any person* alleging discrimination on the basis of disability in violation of section 12132 of this title."); [9] 42 U.S.C. § 12188 ("The remedies and pro-

---

9. With respect to redress for discrimination in violation of 42 U.S.C. § 12132, Congress referred to remedies available under Section 505 of the Rehabilitation Act of 1973, 92 Stat. 2982, 29 U.S.C. § 794a. The ADA's Title II enforcement provision extends relief to *"any*

*person* alleging discrimination on the basis of disability." 42 U.S.C. § 12133. Similarly, the Rehabilitation Act extends its remedies to *"any person aggrieved"* by the discrimination of a person on the basis of his or her disability. 29 U.S.C. § 794a(a)(2).

cedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to *any person* who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title."); 42 U.S.C. § 3613(a)(1)(A)("An *aggrieved person* may commence a civil action in an appropriate United States district court or State court ... to obtain appropriate relief with respect to such discriminatory housing practice or breach.").

ERISA, on the other hand, as noted above, specifically enumerates those parties that are permitted to bring suit, a list that does not include states. Unlike the statutes under which federal courts have recognized states' *parens patriae* standing, "[f]ederal courts have predominantly treated the terms of [ERISA] as exclusive and have denied standing to plaintiffs not specifically enumerated therein." *St. Francis Hospital and Medical Center*, 776 F.Supp. at 661. Among these courts is the Second Circuit. *See Pressroom Unions–Printers Income Security Fund v. Continental Assurance Co.*, 700 F.2d 889 (2d Cir.1983). Thus, ERISA's civil enforcement provisions are different than the federal statutes under which states have been granted *parens patriae* standing in that ERISA expressly *limits* the class of persons entitled to bring suit.

In short, although the court is mindful of the Second Circuit's broad view of *parens patriae* standing, *see Peter & John's Pump House, Inc.*, 914 F.Supp. at 814, the typical concerns do not apply in the unique context of ERISA. Because the State's general interest in the health and well being of its citizens cannot overcome the broad preemptive scope of ERISA; because ERISA provides adequate alternative means of civil enforcement by which individual plaintiffs may obtain complete relief; and because the civil enforcement provisions of ERISA are exclusive and limit potential plaintiffs to those specifically enumerated therein, *parens patriae* standing is not appropriate under ERISA section 502(a)(3).

### C. Standing As Assignee of Participants

For virtually the same reasons, the State does not have standing through the assignment of rights from the individual plan participants named in the complaint. As discussed above, the civil enforcement provisions of ERISA are exclusive and provide standing only to plaintiffs who are specifically enumerated therein. *See Pressroom Unions–Printers Income Security Fund*, 700 F.2d at 892; *St. Francis Hospital and Medical Center*, 776 F.Supp. at 661. Assignees, however, are not granted standing by the civil enforcement provisions of ERISA; nor are legal representatives, as they are in some other statutes.[10] *See* 29 U.S.C. § 1132(a); *see also Chamber of Commerce*, 601 F.Supp. at 109 ("the Congressional scheme does not contemplate ... taking assignments of such claims and prosecuting them on behalf of employees.").[11]

---

**10.** Executors are not listed as parties empowered to bring suit under section 502. Accordingly, this decision raises a potential conflict with the many cases that have permitted executors to bring actions for payment of ERISA benefits, at least in the context of pension plans. These cases may be explained by the fact that, by operation of law, the executor is the only person through whom the beneficiary, i.e., the estate of a plan participant, can act.

**11.** PHS argues that the individuals assignments are invalid because each of the plans at issue contain a valid anti-assignment clause. Among other things, the State responds that, the assignments in this case are valid; that the anti-assignment clause on which PHS relies is unclear; and in any event, the purported anti-assignment clause should be excluded from consideration on a motion to dismiss. The court has not relied on the anti-assignment clause in ruling on this motion to dismiss.

The State's attempt to bring suit in its capacity as the assignee of plan participants and/or beneficiaries is inconsistent with the statutory scheme of section 502(a), a provision that "demonstrates Congress' care in delineating the universe of plaintiffs who may bring certain civil actions." *Harris Trust and Savings Bank,* —— U.S. ——, 120 S.Ct. at 2187.

As noted above, states are expressly empowered by section 502(a)(7) to bring only a very limited class of cases. 29 U.S.C. § 1132(a)(7). Having empowered states to bring one type of ERISA enforcement action, Congress would surely have included states in section 502(a)(3) had it intended to empower them to bring actions such as the present one as the assignee of plan participants and/or beneficiaries. *See Lubrizol Corp.,* 737 A.2d at 867 n. 6. The statutory provisions relating to state acquisition of the rights of third parties through assignment, which are limited to reimbursing the states for payments made under state plans for medical assistance, *see* 29 U.S.C. § 1169(b), would have included a broader empowerment of the states to use assignments from third parties had Congress intended to grant broader rights.

Although Congress did not specifically prohibit suits by states as the assignee of plan participants and/or beneficiaries in section 502, "Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Massachusetts Mutual Life Insurance Co.,* 473 U.S. at 146, 105 S.Ct. 3085 (emphasis in original); *see also Pressroom Unions–Printers League Income Security Fund,* 700 F.2d at 892 ("absent such expression, § 1132[ ] should be viewed as an exclusive jurisdictional grant."). Because "[f]ederal courts have predominantly treated the terms of the Act as exclusive and have denied standing to plaintiffs not specifically enumerated therein," *St. Francis Hospital and Medical Center,* 776 F.Supp. at 661; *see also Lifetime Medical Nursing Services, Inc.,* 730 F.Supp. at 1195, standing as the assignee of plan participants and/or beneficiaries is unavailable to the State.

## IV. *Conclusion*

Although the ERISA statute could conceivably be better enforced if states could sue under section 502(a)(3), Congress did not see fit to grant such standing. Unlike other statutes, where Congress did not implicitly deny state standing by limiting the class of potential plaintiffs, that is precisely what Congress did in ERISA. Accordingly, under this unique statutory scheme, even indirect state standing under *parens patriae* or by way of assignment is unavailable to the State. This court cannot expand the scope of potential plaintiffs by a judicial order that conflicts with Congress' intent to limit standing.

This is not to say, however, that individual enrollees are necessarily without a cause of action in federal court or that grounds for a class action do not exist. Indeed, without expressly deciding whether the complaint states a cause of action, taking the allegations therein as true, it would appear that the representative enrollees have very legitimate and serious concerns that could form the basis of a valid lawsuit. The problem, however, is with the identity of the party who has attempted to bring those claims on their behalf in this case.

For all of the foregoing reasons, PHS' Motion to Dismiss (doc. # 10) is GRANTED. The clerk is instructed to close the file.

It is so ordered.