OPINION OF THE COURT
Charles Edward Ramos, J.
In motion sequence 014, defendant Richard A. Grasso moves, pursuant to CPLR 3211 (a) (7), to dismiss four out of the six causes of action brought against him by the People of the State of New York, by and through their attorney, Eliot Spitzer, Attorney General of the State of New York. The Attorney General seeks to enforce that part of the Not-For-Profit Corporation Law which requires reasonable compensation. According to the Attorney General, Mr. Grasso’s compensation and benefits were not “commensurate with services performed.” (N-PCL 202 [a] [12].)
The causes of action at issue in this motion are: the first cause of action seeking to impose a “constructive trust” and restitution of Mr. Grasso’s compensation; the fourth cause of action claiming that Mr. Grasso should return monies received in excess of reasonable compensation under a theory of money had and received; the fifth cause of action whereby plaintiff asserts that a majority of the board did not approve Mr. Grasso’s compensation awards under the capital accumulation plan (CAP) and supplemental executive retirement plan (SERF) programs and therefore are voidable for “fixing of salaries” under N-PCL 715 (f); and the sixth cause of action claiming that Mr. Grasso improperly received a loan violating N-PCL’s prohibition against loans under section 716. The two remaining causes of action, not the subject of this motion, are the second, to set aside Mr. Grasso’s compensation as an “unlawful conveyance” under N-PCL 720 (a) (2), and the third cause of action for breach of fiduciary duty, under N-PCL 717 and 720 (a) (1) (A) and (B).
*386 Background[1]
At the time the events at issue in this action transpired, the New York Stock Exchange, Inc. (NYSE) was incorporated under article 14 of the N-PCL as a hoard of trade and self-regulating private membership organization, where members held a total of 1,366 seats, rather than shares, in the corporation. The seatholders paid the NYSE annual fees, generating revenue for the NYSE. Seatholders work their seats or lease them to firms who wish to gain physical access to the NYSE trading floor.[2]
Defendant Richard Grasso served as the chairman and chief executive officer (CEO) of the NYSE from 1995 until he resigned on September 17, 2003, amidst growing scrutiny and controversy surrounding the amount of his compensation.
The NYSE’s compensation committee was responsible for determining Mr. Grasso’s compensation. Pursuant to a policy designed to attract and retain “world class talent,” the committee compared what CEOs at top corporations received (comparator group). (Complaint 1i 55.) During his tenure as NYSE CEO, Mr. Grasso’s compensation was governed by three agreements executed by the compensation committee, each fixing his annual salary at $1.4 million in addition to permitting him to participate in various compensation and benefits programs.
The NYSE compensation and benefits programs Mr. Grasso was entitled to participate in included: an incentive compensation plan (ICP), based upon the NYSE’s performance measured against certain targets (Mr. Grasso received a $13.6 million ICP award for 2000 and a $16.1 million ICP award for 2001); the CAP, which entitled Mr. Grasso to a deferred award equal to 50% of his ICP award and which did not vest until May of 2005 (while CAP was not part of Mr. Grasso’s employment agreements, he allegedly received CAP-like benefits); a long term incentive plan (LTIP), intended to reward NYSE executives in the event the NYSE achieved three-year performance targets (Mr. Grasso received LTIP awards for the three-year cycles ending in 1998, 1999 and 2000); the SERI? designed to provide a supplemental pension based upon compensation that exceeded pension limits imposed by federal law (Mr. Grasso did not participate in the NYSE’s SERI? but his employment agreements *387 provided for certain SERP-like benefits, and the size of his compensation awards in 1999 through 2001 resulted in SERF accumulations of over $100 million); and a supplemental executive savings plan (SESP), which enables NYSE executives to defer taxation on compensation that exceeded the federal limit on contributions to a 401 (k) plan (the NYSE matched up to six percent of their base salary).
Mr. Grasso’s first employment agreement (the 1995 agreement) covered a five-year period and was renegotiated in May of 1999 (the 1999 agreement). Under the 1995 agreement, Mr. Grasso allegedly received a payment of $6.6 million in accumulated SERF benefits, which payments are typically payable only upon the executive’s retirement. The Attorney General maintains that the payment of Mr. Grasso’s accumulated SERF benefits well before his retirement amounted to an improper, interest-free loan.
A third agreement was entered into on August 27, 2003 (the 2003 agreement), which extended the term of Mr. Grasso’s employment until 2007. Under the 2003 agreement, Mr. Grasso received an immediate payment of $139.5 million, more than four times the total compensation of $17.8 million he received for the preceding four years when he served as CEO. The compensation committee was allegedly falsely told at the time that the $139.5 million payment to Mr. Grasso would actually save the NYSE $4 million.
Mr. Grasso stood to receive an additional $48 million under the 2003 agreement over the next four years through participation in the compensation and benefits programs described above, benefits that had been accumulating since 1999. Allegedly, the main purpose behind extending Mr. Grasso’s employment term under this agreement was to avoid recording the $24 million expense for Mr. Grasso’s SERF payment on the NYSE books, thus allowing the NYSE to amortize the payment over a longer employment term to offset the resulting loss in NYSE earnings that would be reported for that year.
According to the complaint, the sum total of Mr. Grasso’s compensation and benefits from 2000 to 2002 was equal to 99% of the NYSE’s net income during those years. The Attorney General alleges that Mr. Grasso wielded enormous influence upon the NYSE Board of Directors, and despite the existence of a nominating committee responsible for selecting individuals to serve on the various committees, Mr. Grasso had “sole authority to assign Directors to Board committees, including the Compensation Committee.” (Complaint H 5.)
*388 Allegedly, Mr. Grasso singlehandedly selected defendant Kenneth Langone to serve as chairman of the compensation committee, an appointment which benefitted Mr. Grasso tremendously. In that capacity, Mr. Langone was responsible for advising the compensation committee regarding the details of Mr. Grasso’s compensation. These conditions effectively permitted Mr. Grasso to exert “unfettered discretion” in fixing the amount of his own compensation, which Mr. Grasso additionally achieved by punishing those directors who wanted to curb his compensation and rewarding those directors and the Wall Street firms they represented who supported an increase in his compensation. (Complaint H 25.) For example, when Merrill Lynch encountered difficulty in gaining NYSE approval to sell a division, its CEO who served on the compensation committee was “quickly assured” by Mr. Grasso that the deal would move ahead. When the Securities and Exchange Commission (SEC) confronted Mr. Grasso with evidence of fraud in equity research analysis, he took no action. (Complaint 1Í 26.)
Moreover, the information presented to committee members voting on Mr. Grasso’s compensation awards was allegedly “inaccurate, incomplete and misleading.” (Complaint 1118.)
As evidence that the compensation committee members were misled regarding the extent of Mr. Grasso’s compensation, the Attorney General maintains that Mercer Human Resources Consulting, Inc. and Hewitt Associates, LLC (retained by the NYSE to provide consulting services to the NYSE in the determination of employee compensation, such as compiling comparator group data and otherwise overseeing the compensation of NYSE executives and preparing materials for the compensation committee to that effect) executed sworn statements as part of a settlement of claims with the NYSE that some of these materials contained misstatements regarding the extent of Mr. Grasso’s compensation. Pursuant to Mercer’s and Hewitt’s settlements, both agreed to disgorge all fees earned for the work performed for the NYSE from January of 2003 to August of 2003, covering the period of time the 2003 agreement was executed.
The NYSE’s director of human resources, Frank Ashen, additionally agreed to return $1.3 million in fees to the NYSE. Defendant Langone was allegedly aware that the report authored by Mr. Ashen to the compensation committee on the eve of the vote taken on the 2003 agreement contained misstatements regarding the high amount of Mr. Grasso’s deferred compensation, but did not direct that any corrections be undertaken.
*389 The complaint details other misrepresentations and/or omissions made to the compensation committee regarding how much Mr. Grasso stood to receive, including whether money Mr. Grasso was entitled to under CAP had vested and was immediately payable and whether certain benefits under SERF had accrued. Mr. Ashen allegedly prepared worksheets that contained an accurate description of Mr. Grasso’s total compensation under the various programs but this was never presented to the committee; instead, Mr. Ashen prepared and presented a second version which omitted the true extent of Mr. Grasso’s compensation.
Further, the information presented to the compensation committee concerning “performance targets” including the “chairman’s award,” a feature of Mr. Grasso’s compensation which is calculated using NYSE performance indicators in a given time period, was allegedly flawed and inaccurate. Despite the existence of a complex calculation scheme to determine the chairman’s award, Mr. Langone disregarded it and instead utilized a method that set the NYSE performance level artificially low so that it could easily be exceeded, resulting in a higher award for Mr. Grasso.
Finally, the Attorney General alleges that the year-long process leading up to the committee’s vote on the 2003 agreement was marred with flaws. The 2003 agreement was approved only when added to the board meeting agenda at the last minute and NYSE’s independent lawyer, retained to advise the NYSE regarding Mr. Grasso’s compensation, was not able to attend. Further, the directors not on the compensation committee present at the meeting were allegedly not briefed on Mr. Grasso’s compensation package or its implications prior to voting on it. Moreover, as discussed above, key aspects of his compensation package were not disclosed and materials provided were actually misleading, including the false representation that Mr. Grasso would be entitled to only $79 million if he “quit today,” when in fact he stood to receive millions more in deferred compensation. Overall, many board members voting on the agreement were unaware that in addition to the $139.5 million immediately payable to Mr. Grasso, he was entitled to an additional $48 million in future payments. Consequently, the Attorney General maintains that because key parts of Mr. Grasso’s compensation package were not fully disclosed and/or mischaracterized to the compensation committee, significant aspects of his compensation were never approved by a vote of the committee.
*390 In early September of 2003, the chairman of the SEC contacted the NYSE and requested information concerning Mr. Grasso’s compensation. In response to growing internal and external pressure, Mr. Grasso agreed to forgo $48 million in future payments and resigned as NYSE Chairman several weeks later.
The Action
The gravamen of the complaint is that Mr. Grasso received excessive compensation in violation of N-PCL 202 (a) (12)’s requirement that the compensation of officers in a not-for-profit corporation be reasonable. Moreover, the Attorney General alleges that Mr. Grasso violated this principle by controlling the NYSE governance structure by improperly exerting his influence as chairman in the selection of members to the compensation committee and thereafter by pressuring members to approve his compensation package, while failing to provide accurate and full disclosure regarding the extent of his compensation.
The claims asserted against Mr. Grasso subject to this motion to dismiss the complaint are: (1) imposition of a constructive trust and for restitution; (2) payment had and received; (3) violation of N-PCL 715 (f); and (4) violation of N-PCL 716.
Discussion
At issue in this motion is the role, if any, the Attorney General should play to defend the integrity of the statutory mandate that executive compensation be reasonable. Mr. Grasso argues that the Attorney General is using the power of his office to fight the NYSE’s battle, a battle which the 1,366 seatholders, some of the wealthiest people in America, are capable of fighting themselves. Mr. Grasso asserts the Attorney General’s power is limited by the N-PCL and the four causes of action at issue in this motion are beyond the scope of that limited power. This court finds that the Attorney General represents the People of the State of New York, including the investing public, none of whom would have standing to bring this action otherwise.
The People have an interest in protecting New York’s not-for-profit corporations, which are presumed to be particularly vulnerable, thus justifying public oversight. N-PCL 201 distinguishes between four types of not-for-profit corporations according to their purpose. A type A not-for-profit corporation may be formed for any nonbusiness purpose including: “civic, patriotic, *391 political, social, fraternal, athletic, agricultural, horticultural, animal husbandry, and for a professional, commercial, industrial, trade or service association.” (N-PCL 201 [b].) It includes the usual membership type organizations, such as a social club, formed “for the mutual benefit of its members.” (Bjorklund, Fishman and Kurtz, New York Nonprofit Law and Practice § 2-2 [a], at 24.) Examples include: country clubs and the American Automobile Association.
A type B not-for-profit corporation is the traditional charity which is the most strictly regulated. (Id.) It must benefit the public. (Id. at 25.) N-PCL 201 (b) specifies the nonbusiness purposes including: “charitable, educational, religious, scientific, literary, cultural, or for the prevention of cruelty to children or animals.” However, the delineation between the categories is not always clear. Examples of entities which could be classified as type As, but are classified as type Bs to ensure greater scrutiny, include educational corporations, cemetery associations, YMCAs and fire departments. (Bjorklund at 26.)
A type C not-for-profit corporation “may be formed for any lawful business purpose to achieve a lawful public or quasi-public objective.” (N-PCL 201 [b]; Bjorklund, § 2-2 [c], at 27.)
A type D not-for profit corporation allows a corporation to be formed under the N-PCL if authorized by another corporate law. (N-PCL 201 [b]; Bjorklund § 2-2 [d], at 28.) Examples include religious or private housing finance corporations. (Bjorklund at 28.) Because of their perceived vulnerability, the N-PCL’s provisions addressing failure in governance and fiduciary responsibility apply to all not-for-profit corporations, from charities to boards of trade. (N-PCL 717, 720.)
The NYSE is a type A corporation or board of trade formed in 1971 for “the purpose of fostering trade and commerce.” (N-PCL 1410 [a] [1].) Mr. Grasso asserts that the NYSE is not like charity not-for-profit corporations in that its members, like shareholders, can protect it. Mr. Grasso thus ignores the one common characteristic of the four types of not-for-profit corporations: they are barred from distributing profits or net earnings to anyone. Not-for-profits,
“unlike their for-profit counterparts, by definition and concept do not have shareholders to whom profits are distributed. Given the absence of shareholders, profits and other market devices to ensure the efficacy of contracts and regularity of operations, the statute contemplates significant public *392 oversight of the finances and major transactions of such entities.” (64th Assoc., L.L.C. v Manhattan Eye, Ear & Throat Hosp., 2 NY3d 585, 590 [2004] [analyzing N-PCL 510 which requires judicial approval of major not-for-profit transactions].)
“Because Type A corporations exist for the mutual benefit of their members, who presumably can monitor organizational affairs in some ways analogous to shareholders of the business corporation and have less contact with the public, most are subject to less regulation from the state.” (Bjorklund, Fishman and Kurtz, New York Nonprofit Law and Practice § 2-2 [a], at 24-25 [1997].)
The court agrees that the NYSE is a unique creature. Nonetheless, it is entitled to the protections available to it as a type A not-for-profit corporation. It is true that, like a for-profit corporation’s shareholders, the NYSE has seatholders who are quite clearly able to protect themselves. (See Higgins v New York Stock Exch., Inc., 10 Misc 3d 257 [Sup Ct, NY County 2005, Ramos, J.].) However, unlike corporate shareholders, seatholders do not share in the profits of the NYSE. Rather, they benefit from membership by conducting for-profit business on the NYSE’s trading floor or leasing their seats to others. As this livelihood depends on membership only, and not on the profitability of the NYSE, there is scant incentive to challenge the NYSE, its officers or directors on the issue of excess compensation.
On a given day, March 8, 2006, for example, 1.7 billion shares were traded on the NYSE valued at over $67 billion, (chttp:// www.nysedata.com/nysedata>.) In 2004, this trading activity of similar magnitude generated a net profit for members using their seats on the exchange of $13.7 billion. (Id.) None of this income was derived from the NYSE itself.
The NYSE is an important institution in New York, employing 1,577 people. (NYSE 2004 Annual Report § 6.) In 2004, it paid state and local taxes of $2,547,000. (Id. n 7.) Its charitable contributions to 126 organizations, many located in New York, totaled $3.8 million in 2004. (Id.)
Its status is further highlighted by the most significant difference between the NYSE and other type A not-for-profit corporations. The NYSE has regulatory authority. (See People v Grasso, 350 F Supp 2d 498, 505-507 [SD NY 2004].) The NYSE is the world’s largest marketplace for the trading of securities. The participants in the NYSE include close to 2,800 listed national *393 and international companies and 84 million individual investors. (Shareownership 2000, NYSE; Recent Changes in US Family Finances: Evidence from the 2001 and 2004 Survey of Consumer Finances, A19.)
The investing community relies on the integrity of the market as well as the NYSE’s governance and regulatory structure which serves it. It is this regulatory power possessed by the NYSE which the Attorney General alleges Mr. Grasso used, or refrained from using, to the detriment of the independence of the NYSE Board and its compensation committee. The Attorney General alleges, as examples, that by his failing to take action in the “Merrill Lynch Case” or against conflicted analysts, Mr. Grasso exercised his power to help compliant board members, and further alleges that power was also used to punish noncom-pliant board members. (Complaint 1HI 25-29.) Investors who rely on the integrity of the market have no standing to challenge such action or inaction. The interests of investors, individual or institutional, are the proper subjects of the Attorney General’s responsibility.
Parens Patriae
The Attorney General predicates his claim of standing on the proposition that the four causes of action may be brought under the parens patriae doctrine, a common-law power to sue in the public interest.
Parens patriae, or “parent of the country,” emanated from the English legal constitutional system whereby the monarch, as the parent of the nation, was granted authority to act to protect those without legal capacity to institute or maintain proceedings. (Hawaii v Standard Oil Co. of Cal., 405 US 251, 257 [1972].) The United States Supreme Court validated the concept of parens patriae as “inherent in the supreme power of every state . . . to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves.” (Late Corp. of Church of Jesus Christ of Latter-day Saints v United States, 136 US 1, 57 [1890].)
The common-law doctrine of parens patriae has been invoked in a variety of contexts: the mentally and physically ill (Caputo v Officers & Trustees of N.Y. Dispensary, 92 NYS2d 547, 550 [Sup Ct, NY County 1949] [in action challenging the consolidation of hospitals, patients’ “interests are in the care of the state as parens patriae, and are represented by the Attorney General”]; Matter of Harry M., 96 AD2d 201 [2d Dept 1983] [Court *394 recognized, the State’s right to exercise parens patriae power to involuntarily confine mentally ill, but ordered new confinement trial because patient was not a harm to himself or others]; Support Ministries For Persons With Aids, Inc. v Village of Waterford, N.Y., 799 F Supp 272 [ND NY 1992] [New York State officials had standing to sue in their parens patriae capacity for persons with AIDS under the Fair Housing Act]); civil rights violations (People v Operation Rescue Natl., 1993 WL 405433, *2, 1993 US Dist LEXIS 13982, *4 [SD NY 1993] [New York Attorney General “has parens patriae standing to redress conspiratorial civil rights violations directed against its citizens”]); general welfare of the community (People v Sturm, Ruger & Co., 309 AD2d 91 [1st Dept 2003] [dismissing the Attorney General’s action against gun manufacturers, but parens patriae authority unchallenged]; see also, Shields v Gross, 58 NY2d 338 [1983] [the New York Court of Appeals granted an injunction against public dissemination of nude photographs of 10-year-old plaintiff under the doctrine of parens patriae as a matter of public policy]); racial discrimination (People v Peter & John’s Pump House, Inc., 914 F Supp 809 [ND NY 1996] [State has interest in preventing racial discrimination against its citizens]; People v Gary M., 138 Misc 2d 1081, 1092 [Sup Ct, Kings County 1988] [“doctrine of parens patriae imposes an obligation on the part of the State to protect the rights of its citizens . . . State is as effective a proponent of the right of the excluded juror”]); children (Matter of Sayeh R., 91 NY2d 306, 313 [1997] [New York has “powerful duty” to protect children from harm]); public nuisance (Town of Riverhead v Long Is. Light. Co., 258 AD2d 643 [2d Dept 1999] [Town had parens patriae authority to bring action for nuisance]; State of New York v Carey Resources, 97 AD2d 508 [2d Dept 1983] [State alleged illegal operation of petroleum storage and transfer facility]).
The Attorney General has sought to protect not-for-profit entities in his parens patriae capacity as well. In the case of Vacco v Aramony, the Attorney General was held to be responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers pursuant to the N-PCL, the EPTL, and his common-law parens patriae authority. (Vacco v Aramony, NYLJ, Aug. 7, 1998, at 22, col 6 [Sup Ct, NY County][3] [the Attorney General brought an action on behalf of members, directors, and officers of United Way of America, a *395 charitable organization whose funds were misappropriated as a result of defendants’ breach of fiduciary duties].) Further, this court held in Spitzer v Lev, “the Attorney General is responsible for the supervision of not-for-profit corporations. This is in addition to the Attorney General’s common law parens patriae authority to protect the public interest in charitable property.” (Spitzer v Lev, 2003 NY Slip Op 51049[U], *7 [Sup Ct, NY County 2003].)
Finally, in Manhattan Eye, Ear & Throat Hosp. v Spitzer, the court held that the Attorney General, acting as parens patriae, was statutorily involved whenever a charity sought to dispose of all of its assets, as Manhattan Eye, Ear & Throat Hospital had resolved to do. (Matter of Manhattan Eye, Ear & Throat Hosp. v Spitzer, 186 Misc 2d 126 [Sup Ct, NY County 1999].)
There are three legal requirements for the Attorney General to act pursuant to parens patriae authority. (Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez, 458 US 592, 607 [1982].) First, the State must identify a sovereign or quasi-sovereign interest of the public. (Id.) Second, that interest must touch a “substantial segment” of the state’s population to enable the Attorney General to assert his parens patriae authority. (Id.) Finally, the State must “articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party.” (Id.; see also People by Vacco v Mid Hudson Med. Group, P.C., 877 F Supp 143, 146-149 [SD NY 1995].)
The Attorney General maintains that the State has a quasi-sovereign interest in ensuring that the NYSE promotes a fair and honest marketplace. For example, in response to consumers’ complaints about defective transmissions, the State alleged that General Motors engaged in fraud and illegal business practices. The court held that “[b]ecause of the State’s quasi-sovereign interest in securing an honest marketplace, it would have parens patriae standing to bring this action.” (State of New York v General Motors Corp., 547 F Supp 703, 705 n 5 [SD NY 1982].) Likewise, the State has an interest in a marketplace free from racial discrimination (see, People v Peter & John’s *396 Pump House, Inc., supra; State of Maine v Data Gen. Corp., 697 F Supp 23 [D Me 1988]).
The Attorney General establishes that this interest affects a “substantial segment” of New York citizens, in that firms listed and utilizing the NYSE trading system include millions of investors, many of whom are residents of this state. Indeed, as a not-for-profit corporation, the ultimate beneficiaries of the NYSE itself are the members of the investing public. Thus, this motion necessarily affects a “substantial segment” of the population and the Attorney General, acting on behalf of the State of New York, is therefore not merely a nominal party.
Neither is the Attorney General seeking to act on behalf of the seatholders, whose private interest in the success of for-profit trading combines with the lack of any meaningful financial incentive to lower NYSE expenses. That the N-PCL enables these seatholders to pursue claims on their own behalf and where they choose not to pursue such claims does not otherwise detract from the substantial public interest at stake in this action. Rather, as discussed above, the Attorney General represents the investing community that lacks the legal capacity to sue here, in order to redress the NYSE’s failure to act within the realm of its internal corporate governance or regulatory frameworks. By granting Mr. Grasso’s allegedly unreasonable compensation, the NYSE Board failed to insure the integrity and viability of the NYSE as an institution which, in turn, affects the interests of the New York investing public. Accordingly, the Attorney General has the authority to bring the challenged claims.
The next issue is whether those causes of action are viable. First Cause of Action: Ultra Vires
The Attorney General seeks to impose a constructive trust on and restitution of Mr. Grasso’s compensation because “Grasso received ultra vires payments” which were not “reasonable” or “commensurate with services performed” under N-PCL 202 (a) (12) and 515 (b).
Without citing relevant authority, Mr. Grasso maintains that the doctrine of ultra vires was abolished by the N-PCL.
N-PCL 203 addressing the defense of ultra vires states:
“(a) No act of a corporation and no transfer of real or personal property to or by a corporation, otherwise lawful, shall, if duly approved or authorized by a judge, court or administrative department or *397 agency as required, be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such transfer, but such lack of capacity or power may be asserted:
“(2) In an action by or in the right of the corporation to procure a judgment in its favor against an incumbent or former officer or director of the corporation for loss or damage due to his unauthorized act.”
Grasso relies on Congregation Yetev Lev D’Satmar v 26 Adar N.B. Corp. (219 AD2d 186 [2d Dept 1996], lv denied 88 NY2d 808 [1996]) for the proposition that under N-PCL 203, the defense of ultra vires cannot be wielded offensively as a sword. In that case, the congregation’s worshipers divided. One group commenced an action against the other after years of transfers of the synagogue property, allegedly in violation of law and internal procedures, but with judicial approval. The Court held that the congregation could not use ultra vires 12 years after the transfers. It also found, on a motion for summary judgment, that the documentary evidence established that judicial approval for the transfers had been properly obtained. In other words, the transfer in Yetev Lev was lawful.
Here, court approval is not an issue and the Attorney General alleges that the NYSE’s payment of $139.5 million to Mr. Grasso violated N-PCL 202 (a) (12) and 515 (b). Accordingly, it is not “otherwise lawful” and the Attorney General’s ultra vires claim may proceed.
Fourth Cause of Action: “Payment” Had and Received
In the fourth cause of action, the Attorney General alleges that Mr. Grasso should repay monies received in excess of reasonable compensation under the doctrine of “money had and received.” Under that theory, the law implies a contract referred to as a “quasi-contract”:
“[T]he law recognizes such a cause of action in the absence of an agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another. It allows [a] plaintiff to recover money which has come into the hands of the defendant impressed with a species of trust because under the circumstances it is against good conscience for the defendant to keep the money.” (Board ofEduc. of Cold Spring Harbor *398 Cent. School Dist. v Rettaliata, 78 NY2d 128, 138 [1991] [internal quotation marks and citations omitted].)
Mr. Grasso argues that the remedy is not available here because the Attorney General has failed to allege bad acts such as “oppression, imposition, extortion, or deceit.” (Parsa v State of New York, 64 NY2d 143, 148 [1984], rearg denied 64 NY2d 885 [1985].)
This list of bad acts is not exhaustive. Rather, the doctrine of money had and received is an equitable doctrine which allows for recovery when equity and good conscience dictate. For example, the remedy is available where money is paid by mistake or in error. (Id.) Nonetheless, the Attorney General alleges that Mr. Grasso abused his position to mislead the compensation committee about the actual amount he was to be paid and punishing or rewarding directors depending on whether they supported his compensation increases or not, the complaint alleges sufficient bad behavior.
Next, Mr. Grasso submits that his compensation was paid pursuant to contract. A contract precludes an allegation of a quasi-contract. (Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382 [1987].) The Attorney General contends that most of Mr. Grasso’s compensation was not made pursuant to a contract. Alternatively, the Attorney General contends that to the extent that payments were made pursuant to a contract, that contract was invalid as a violation of N-PCL which requires compensation to be reasonable. Therefore, the Attorney General’s allegations are sufficient to survive a motion to dismiss and the fourth cause of action is sustained.
Fifth Cause of Action: Fixing of Salary in Violation of N-PCL 715
In the fifth cause of action, the Attorney General maintains that a majority of the board did not effectively vote to approve Mr. Grasso’s CAP and SERF awards, comprising pension benefits and deferred bonuses, as the board was presented with allegedly inaccurate and incomplete information regarding the extent of the benefits, rendering them voidable as violative of N-PCL 715.
In contrast, Mr. Grasso maintains that these benefits do not constitute “salary” within the meaning of N-PCL 715 (f), and therefore this provision is not applicable to the payments at issue.
N-PCL 715 provides that contracts between a corporation and a financially interested director may be voided unless the *399 financially interested director establishes that the contract was both fair and reasonable to the corporation, and effectively authorized by the board. (N-PCL 715 [b].)
N-PCL 715 (f) provides for the process by which a board fixes the salary of an officer: “The fixing of salaries of officers, if not done in or pursuant to the by-laws, shall require the affirmative vote of a majority of the entire board unless a higher proportion is set by the certificate of incorporation or by-laws.”
N-PCL 715 (e) discusses compensation: “Unless otherwise provided in the certificate of incorporation or the by-laws, the board shall have authority to fix the compensation of directors for services in any capacity.”
To the extent that N-PCL 715 (f) provides that the fixing of salaries requires the affirmative vote of a majority of the board in the absence of contrary language in the bylaws, an argument can be made that N-PCL 715 (f) does not apply to other compensation. Accordingly, irrespective of whether a majority of the board voted to approve Mr. Grasso’s SEEP and CAP awards, those benefits might not be voidable under this provision (N-PCL 715 [f]) because they might not be considered “salaries.” However, in light of the fact that the complaint contains allegations that both Mr. Grasso’s salary and compensation were improperly fixed and the Attorney General relies on all subdivisions of N-PCL 715, both N-PCL 715 (e) and (f) apply to this case, thereby mooting this issue. In addition, the identical issues of improperly awarded salary and compensation are raised in other causes of action, rendering this cause of action potentially redundant.
Therefore, the motion to dismiss the complaint is denied as to the fifth cause of action. These issues may be more appropriately dealt with on a motion for summary judgment once discovery has been completed.
Sixth Cause of Action: Prohibition against Loans to Directors and Officers
Mr. Grasso received a payment of $6.6 million on May 11, 1995 and $29 million on May 3, 1999. The Attorney General alleges in the complaint that these payments amounted to an interest free loan from the NYSE. Mr. Grasso characterizes the payments as advances on his accumulated SEEP benefits under the 1995 contract which would typically be paid to him only upon his retirement. The Attorney General contends that the “loans” violate N-PCL 716, which provides:
“No loans . . . shall be made by a corporation to its *400 directors or officers, or to any other corporation, firm, association or other entity in which one or more of its directors or officers are directors or officers or hold a substantial financial interest, except a loan by one type B corporation to another type B corporation. A loan made in violation of this section shall be a violation of the duty to the corporation of the directors or officers authorizing it or participating in it . . . .”
Mr. Grasso relies on N-PCL 1410 (c) (2) which also applies to the NYSE as a type A not-for-profit corporation. It allows a board of trade to make a loan to its directors and officers “in any case where its board of directors finds that the making of such loan will be in furtherance of its corporate purposes and for a lawful public or quasi-public objective.” (N-PCL 1410 [c] [2].) However, the board must first recognize the purpose of the loan. It is alleged that no decision was made by the NYSE Board finding that the “loans” to Mr. Grasso were in furtherance of the NYSE’s corporate purpose. Rather, plaintiff alleges that the amount of the SERF was never identified to the directors and the consultant’s report explaining the context was withheld from the board. (Complaint 1i1i 79, 88.) If the board did not properly authorize the payments, and the payments are loans, then they would be barred by N-PCL 716. However, whether the payments constituted loans within the meaning of the statute is an issue of fact, the determination of which is impermissible on a motion to dismiss. Therefore, Mr. Grasso’s motion to dismiss the sixth cause of action is denied.
Court Order Giving Attorney General Standing to Sue[4] Finally, the Attorney General argues that this court should issue an order pursuant to N-PCL 112 (a) (9) providing him with authority to bring the four challenged claims against Mr. Grasso. N-PCL 112 (a) (9) provides:
“The attorney-general may maintain an action or special proceeding: . . .
“(9) Upon application, ex parte, for an order to the supreme court . . . and if the court so orders, to enforce any right given under this chapter to members, a director or an officer of a Type A corporation. For such purpose, the attorney-general shall have the same status as such members, direc *401 tor or officer.”
The parties failed to provide the court with any reported cases involving N-PCL 112 (a) (9) and the court found none. Were this court to consider issuing such an order, however, it would perform the same analysis as above, yielding the same result. Absent a proper motion, this court will not issue an ex parte order.
Accordingly, it is ordered that Mr. Grasso’s motion to dismiss is denied.

. The background is taken from the allegations in the Attorney General’s complaint unless otherwise indicated.

. For a discussion of the NYSE’s history and current legal status, see this court’s decision in Higgins v New York Stock Exch., Inc. (10 Misc 3d 257, 259, 277 [Sup Ct, NY County 2005, Ramos, J.]).

. The Attorney General relies on Vacco v Diamandopoulos (185 Misc 2d 724, 729-730 [1998]) for the proposition that this court upheld the State’s pa *395 rens patriae authority to bring claims for conversion, unjust enrichment, and money had and received against a law firm. The action was commenced to hold defendant university trustees financially accountable for mismanagement of the university’s assets. However, the Attorney General’s authority was not at issue in that case. Rather, this court simply set forth the necessary elements for the Attorney General’s claims.

. However, the Attorney General did not cross-move for this relief so the request is not properly before the court.